**C. Nelson SHIELDS, Jr., Trustee, and Advance Engineering, Inc., (an indirect subsidiary of Baker International Corporation), Plaintiffs,**

v.

**HALLIBURTON COMPANY, Halliburton Services, Brown & Root, Inc., and Brown & Root Marine Operators, Inc., Defendants.**

Civ. A. No. 78–0065.

United States District Court
W. D. Louisiana,
Lafayette-Opelousas Division.

June 26, 1980.

Robert W. Turner, Hubbard, Thurman, Turner, Tucker & Glaser, Dallas, Tex., for plaintiffs.

James E. Cockfield, Kenway & Jenney, Boston, Mass., for defendants.

## OPINION

SHAW, District Judge.

### A Patent Case

Plaintiffs are C. Nelson Shields, Jr., Trustee and assignee of the two patents in issue, and Advance Engineering, Inc., exclusive licensee and an indirect subsidiary of Baker International Corporation. The defendants are Halliburton Company, Halliburton Services, Brown and Root, Inc. and Brown and Root Marine Operators.

The plaintiffs claim that defendants have infringed claims 1–15 of their U. S. Bassett & Olsen Patent 28,232[1] and seek to have this patent held valid, enforceable and infringed. Defendants deny these claims and

1. The original application for a patent which ultimately evolved as issued Patent No. RE 28,232 was filed September 18, 1969, and issued August 31, 1971, as original U. S. Letters Patent No. 3,601,999 with only one claim which is now Claim 1 of RE 28,232 filed July 11, 1973, and issued November 5, 1974.

additionally, ask the Court to declare a second patent of plaintiffs, U. S. Patent No. 3,832,857 (on which a previous charge of infringement has been withdrawn) to be invalid and unenforceable.

The present proceeding is limited to the issue of liability of the defendants for patent infringement with the actual accounting for damages being severed.

## I

### Background of the Patent[2]

The determination of this case is of paramount importance because if the patent is valid, the plaintiffs, for all practical purposes, would enjoy a time-limited monopoly in grouting offshore structures for oilwell drilling and production operations.

Since the 1950's, many of these structures or platforms have been placed offshore and they stand on the sea bed on *tubular jacket legs* (usually 4 to 8 legs per platform) and include *piles* which are driven through the interior of the legs, along their length, and into the sea bed to aid in the stability of the structure.

When an offshore platform is set, the jacket legs are generally open at the bottom to the sea, and the annulus between the pile and jacket legs will fill with water up to the water line of the surrounding ocean. A water filled *annulus* is thus created along the inside length of each of the jacket legs between the pile and the jacket leg.

### Conventional Grouting vs. Air Pressure Grouting

A common practice since the late 1950's, has been to place *grout* or *cement* in the annulus formed to help increase the stability of the overall structure by bonding the pile to the jacket leg. . At that time, the conventional grouting procedures for new platforms under construction was to install *two* grout lines on each leg near the lower end of the leg up to just above the water line. One line would be located below the

other and an initial plug of grout would be placed in the bottom of the leg using this line in an attempt to seal the bottom of the leg to prevent loss of the main column of grout to be *subsequently* added. After the initial plug was set, and if it had been successfully placed, the second stage of grouting could proceed with filling of the annulus above the plug by the second grout line. The grout would displace the sea water in the leg up the annulus and *out the top* and if grout of good consistency would eventually flow out of the top of the leg, the operation was a success.[3]

In the case of ungrouted platforms, originally set without grout lines, there was little success. Attempts were made by forcing grout in the top of the leg through sea water in the leg by placing a small grout pipe down the annulus. Another method was to use deep-sea divers to install clamps and valves onto the legs below the water line near the bottom of the legs to permit grout lines to be hooked for grouting operations from the bottom of the leg as described above.[4]

Conventional grouting presented a number of problems. Many times, the first stage plug would fail to hold and consequently, second stage grout would be lost out of the bottom of the leg. Once this occurred, the original grout lines could not be reused as they would be filled with hardened grout. Although conventional grouting is still used today, it is not the desired method from a point of time, economy or results.[5]

In the latter part of 1968, or the first two months of 1969, Max Bassett, through a company he had formed, called Guardian Engineering, attempted, unsuccessfully, to perform a conventional grouting job for McDermott.[6] He noticed a small air compressor on the barge that divers had been using. Being completely out of ideas and having nothing to lose at this point, he

---

2. In the annotations, "TR"—Trial Record; "PS"—Pre-Trial Stipulation; "PX"—Plaintiffs' Trial Exhibits; "DX"—Defendants' Trial Exhibits; and "Dep."—Deposition.

3. Bassett TR 88–96; Fry TR 440–441; PX–131, DX–56 and DX–57.

4. Fry TR 1027–1030; Frazier TR 797.

5. Bassett TR 90–91, 98–99; Fry TR 442–443.

6. Bassett TR 98–103.

attempted to dewater the annulus with air pressure applied at the top prior to grouting and was successful. He used air pressure to prevent water from returning to the leg while introducing grout from the top of the leg.[7] The evidence is not clear as to whether or not this operation was a complete success, but there is no doubt it was the first time that this procedure had ever been applied. A few days later, Bassett disclosed this air pressure grouting procedure to H. W. Olsen (now deceased) who had some additional ideas to be used. The first item was the use of a vibrator device to be attached to the upper end of the jacket leg to help the expulsion of water by air pressure in a *firm* sea bottom. In case a soft sea bottom is not encountered, it may be necessary to break the bond at the bottom of the leg between the leg and the sea bottom to permit water to be driven out. The second item that Olsen contributed provided that if a short plug (less than one-half the annulus) is used in the first stage of grouting, the grout can be constrained or loaded by the air pressure until it is fully set. By not releasing all the air during grouting, this short plug is formed and air pressure is held on the plug until it sets.[8]

Mr. Olsen, who later assigned all of his rights in the patents to Bassett, and Bassett, submitted their joint ideas to a patent attorney, which resulted in the issuance of United States Patent No. 3,601,999 on August 31, 1971. In the meantime, Bassett disclosed the air pressure grouting concept to Mr. Cliff Tannahill of Union Oil Company in February, of 1969, and Bassett's company, Guardian Engineering, was awarded a job which was successfully completed in June, of 1969. In connection with the Union job, Bassett made an arrangement with a James Ratteree to supervise the field operations and explained the entire procedure to Ratteree.[9] Bassett and Ratteree did several jobs together and terminated their relationship. The defendants claim that during this relationship, Ratteree conceived the idea independently of Bassett and Olsen, of a reducing air pressure feature, which operates in the following manner: As the grout is introduced, the air pressure is monitored and controlled to prevent ingress of water that might dilute the grout. This control is generally provided by letting out air pressure as grout pressure builds up in the annulus to maintain a static air pressure in the leg. By doing this, the combination of air pressure and hydrostatic pressure of the grout substantially equals the hydrostatic pressure of the sea water at the bottom of the leg, which is trying to enter the leg. Thus, as the hydrostatic pressure of the grout rises, the air pressure is bled off, and reduced. It should be noted that when the annulus is about half full, the hydrostatic pressure of the grout, without any air pressure, will provide the pressure to keep the sea water out of the annu-

7. In these procedures, grout is introduced through a nipple installed near the top of the leg, PS, Section 5, PX–1, PX–1B, PX–2.

8. Bassett TR 118–120.

(PLAINTIFF'S EXHIBIT 114 – ADVANCE ENGINEERING, INC. BROCHURE)

9. Bassett TR 131–135; PX 82.

lus; i. e., a hydrostatic balance will prevail.[10] Bassett claims that he told Patteree that that they would have to reduce air pressure to compensate for the buildup of grout pressure. As the story unfolds, it will be seen that no *specific* mention of air pressure reduction is disclosed in the patent under consideration, RE No. 28,232.

From September, of 1969, until late 1972, Bassett was generally unsuccessful in gaining the support of the oil industry in using his new method.[11]

Bassett employed two University of Houston professors to conduct a model study of the air pressure grouting method in 1972, which resulted in a film used in advertising and selling of the air pressure grouting method, to the industry. Around 1975, the method became commercially acceptable[12] and was used by many of the major oil companies including Gulf, Texaco, Exxon, Shell and Mobil.[13] Further, many platforms constructed and designed today for grouting do not include the conventional grout lines and are designed specifically for use of the air pressure grouting procedure.[14] It has been estimated that in the future, air pressure grouting will be used in seventy-five (75%) per cent to eighty (80%) per cent of the grouting jobs.[15]

In late 1972, Bassett presented his grouting method to the Western Company, and in January, of 1973, Western became the exclusive licensee under the Bassett and Olsen patent U. S. No. 3,601,999. Mr. Ned Conley, the attorney for the Western Company, felt that Bassett was entitled to broader protection than was granted in the patent, and filed additional applications, including the issuance of RE 28,232, and the 3,832,857 patent also involved in this suit.[16] Claim 10 of 3,832,857 (overdisplacing), is directed to a procedure in which a predeter-

mined amount of grout is added to the top of the initial plug after all the air pressure is relieved and prior to setting up to force any water in the bottom of the leg out.

As a result of a 1974 suit, Advance Engineering replaced Western as the exclusive licensee under the Bassett patents and Advance continues in that position today.

It appears that from 1968, to 1977, the defendants, Halliburton, and Brown and Root, unless they used Advance Engineering for air pressure grouting, continued to use grouting methods from the bottom of the leg. In August, of 1977, defendants performed their first air pressure grouting job on a Freeport Sulphur platform, notwithstanding the fact that they were well aware of the Bassett patents since 1974.[17] Plaintiffs contend that Halliburton has performed approximately twelve pressure grouting jobs to date, and will continue to infringe unless enjoined by this Court.

## II

### *General Patent Law*

A patent is a contract between the government of the United States and an inventor in which the inventor is given a limited monopoly on his invention for seventeen (17) years in exchange for disclosing it to the public which may thereafter be used by anyone. *Harrington Mfg. Co., Inc. v. White*, 5th Cir., 475 F.2d 788. Thus, infringement of a patent occurs whenever any person, without authority, makes, uses or sells the patented invention anywhere in the United States during the term of the patent. The patent document itself generally includes drawings, a written description of one or more "claims" which describes in words, the metes and bounds of the invention, sufficient to permit persons skilled in the art to make and use the invention. 35

10. TR 263 265.

11. During 1971–72, Bassett was having personal and financial problems and his patent rights were conveyed to Shields, as trustee for Bassett, and his former wife, as guardian of his minor daughter. During the same period, Bassett turned Guardian Engineering over to an employee, Floyd Jones. In May, of 1972, Guardian Engineering ceased its business operations, and Jones started a new company, Advance Engineering, to perform grouting services (Bassett TR 157–160).

12. Fry TR 474–475.

13. Bassett TR 170, 204, PX 115.

14. Bassett TR 169–170, 207, PX 113 and Mobil Oil Company drawings, PX 6 to PX 10.

15. TR 474–475.

16. Conley TR 300–307.

17. TR 417–426; PX 123.

U.S.C. § 112.[18] The claims define that subject matter from which others may lawfully be excluded.[19] The requisites for a valid patent are statutory (35 U.S.C. §§ 101, 102, and 103),[20] and require that the invention:

1. Be new or novel;

2. Be useful; and,

3. That the difference between the prior art and invention not be such as to be obvious to persons skilled in the art at the time the invention was made.

When novelty, utility and unobviousness are found to exist, there is patentability, and that is usually the end of the matter.

A utility patent may be granted under 35 U.S.C. § 101 for a process.

35 U.S.C. § 100. Definitions, defines "process" as:

**18.** 35 U.S.C. § 112 provides:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

"Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

"A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

**19.** It is only the claims of the patent that can be infringed. However, the specification and drawings can be used to explain the meaning of the words used in the claims.

**20.** 35 U.S.C. § 101 provides:

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof may obtain a patent there-for, subject to the conditions and requirements of this title. * * *"

35 U.S.C. § 102 provides:

"A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other. * * *"

35 U.S.C. § 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. * * *"

". . . process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."

■ A method patent is infringed when the patented and accused methods operate in substantially the same manner and under the same physical law to produce substantially the same result. *Phillips Petroleum Co. v. Sid Richardson Carbon and Gas Go.*, 416 F.2d 10 (5th Cir. 1969).

■ The subject matter of a patent application is examined in the United States Patent Office, and the record is called the "file wrapper". When the patent issues, it is presumed by statute to be valid. 35 U.S.C. § 282. It is on the question of obviousness of the invention at the time it was made that the Courts have the most problems and *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), established the steps to be followed in dealing with this issue. First, the scope and content of the prior art is to be determined. Second, the difference between the prior art and the claims in issue is to be determined, and last, the level of skill of persons skilled in the art at the time of the invention is to be determined.[21]

### III

### *The Claims of RE 28,232*

■ It is common and desirable for a patent to have a number of claims that define the invention from its broadest terms to progressively narrower definitions.[22] However, it is not necessary to claim all the details related to an invention if sufficient subject matter is stated to distinctively point out and claim the invention. 35 U.S.C. § 112. Subject matter which can reasonably be furnished by persons skilled in the art need not be specifically claimed where it is not the novel contribution of the

inventors. Claims 1 and 12 of RE 28,232 state:

Claim 1. A method of grouting an offshore structure having at least one supporting leg including a tubular jacket extending downwardly from above the waterline to the seabed and a piling driven through said jacket into the seabed with an annular space existing between the inside of the jacket and said piling; said method comprising the steps of

a. Sealing the upper end of said jacket to said piling so as to close said annular space at the upper end of the jacket;

b. Introducing compressed air into said annular space at a point adjacent the upper end of the jacket and above the waterline so as to expel water from said space through the lower end of the jacket;

c. Introducing fluid grouting material into said annular space at a point adjacent the upper end of the jacket and above the waterline after water has been expelled from said space as aforesaid;

d. Simultaneously maintaining static air pressure in said annular space sufficient to prevent ingress of water through the lower end of said jacket while the grouting material is being introduced into said space; and,

e. Permitting the grouting material to set.

Claim 12. A method of grouting an offshore structure having at least one supporting leg including a substantially vertically extending tubular jacket having its lower end in the seabed and a piling in said jacket driven into the seabed having an outside diameter smaller than the inside diameter of the jacket whereby a space is formed between the inside of the

---

**21.** In *Graham*, supra, the Supreme Court made it clear that it will permit a practical test of patentability and that courts may properly infer non-obviousness from evidence of long felt but unsolved needs, failures of others, and subsequent commercial success and acceptance. 383 U.S., at 17–18, 86 S.Ct., at 693–694.

**22.** RE 28,232 includes 15 claims. Claims 1, 2, 7, 12 and 13 are called independent claims and stand by themselves while the remaining claims are dependent claims. Although plaintiffs claim that defendants have singularly and jointly infringed Claims 1–15 of RE 28,232, plaintiffs need only establish infringement of one claim and for the purposes of this suit, only Claims 1 and 12 need be considered.

jacket and said piling; said method comprising the steps of

  a. Sealingly enclosing said space at its upper end;

  b. Introducing compressed gas into said space so as to expel water from said space through the lower end of the jacket into the seabed until all the water has been expelled from said space;

  c. Controlling the gas pressure to maintain a static gas pressure sufficient to prevent ingress of sea water through the lower end of the jacket;

  d. Introducing an initial fill of fluid grouting material into said space at a point adjacent its upper end while such gas pressure is being maintained;

  e. Permitting the initial fill of grouting material to set;

  f. Introducing sufficient additional grouting material to substantially fill said space; and,

  g. Permitting the additional grouting material to set.

The only issue raised by plaintiffs and on which they have the burden is that U.S. Patent RE 28,232, is infringed by defendants on at least one (1) claim. On the other hand, defendants have alleged several interwoven defenses. Under Section 112, the patentee must disclose the "best mode" contemplated for carrying out of the alleged invention. The defendants claim that although aware of the air releasing feature, Bassett and Olsen did not disclose same. Defendants further claim that this feature did not originate with the alleged inventive entity of Bassett and Olsen, but was derived by Bassett from James W. Ratteree. Further, defendants contend that their operations are different as to means, operations and result with respect to the subject matter of these claims; i. e., the patent disclosure features only a non-vented air supply which operates to contain air originally supplied to a jacket leg annulus for the purpose of displacing water, in order to constrain and load a mass of grout injected into the annulus so as to prevent grout shrinkage. The defendants claim that they did not perform the step of "sealing" the upper end of a platform jacket to a piling inserted therein.

## IV

### The Prior Art

■ The defendants rely on the patent to Hagius [23] owned by defendant, Halliburton, filed in 1964, and issued in 1966. They contend that the disclosure of Hagius made the subject matter as a whole, *obvious*, viewing the prior art at the time of the invention. Although both Hagius and the patent in question herein have in common the use of air pressure to remove water from a grouting zone and permit the setting of grouting fluid in this zone prior to the return of water to the grouting zone, in the Court's opinion, the resemblance ends there, notwithstanding the persuasive testimony to the contrary by the defendants' expert, Mr. David Joseph Williamowsky.[24] Hagius is not directed to offshore grouting operations, to grouting of an *annulus* or to grouting from the top. There is no water pressure at the bottom of the annulus during grouting. Hagius does not face or address the problem of losing grout from the bottom of the leg. It contemplates a method for injecting grouting fluid into *earthern* material such as water-saturated backfill adjacent to a foundation wall. If the Hagius method were applied to the grouting of an offshore structure, the result would be to pump grout into the ocean floor forever.

The Evans patent cited in the references is more relevant than Hagius [25], as Evans deals with offshore structures and Hagius

---

23. Although Hagius does not appear in the references cited in RE 28,232, the same patent examiner, Mr. Jacob Shapero, examined both. Section 282 of Title 35 of the United States Code states that a patent duly issued by the patent office is presumed to be valid. Thus, the defendant has the burden of coming forward with clear and convincing evidence (more than a preponderance) to establish that the patent in suit or any claim thereof, is not valid. However, this presumption exists only to the record before the examiner.

24. TR 829–1016.

25. Gambrell TR 570–571, 740.

does not. Evans is concerned with a method of installing a pipe nipple in the wall of a casing and then an explosive charge is detonated in the nipple so as to expand the nipple in hold. The Evans patent is directed to grouting procedures in which grout is injected at the bottom of the annulus as in the conventional grouting method. Also, Evans disclosed the use of air pressure applied at the top of the annulus to drive the majority of the water out a nipple near the bottom of the annulus. The defendants' patent expert agreed that Hagius, unlike Evans, did not have to worry about losing all of the grout out the bottom or the problem of balancing equilibrium. Since the art cited by defendants (Hagius patent) is at most, no better than the art considered by the patent examiner, the presumption of validity will not be affected.[26]

The defense that defendants' use of air pressure grouting in 1966, even if proven, could not be accepted as prior art, as defendants did not appreciate what they had done and it was abandoned or purposely concealed. 35 U.S.C. § 102:

> "The right to a patent is not affected by abandoned experiments uncommunicated to the public especially where the circumstances show that the experimentor did not appreciate the virtues and advantages of the invention". *Hughes Aircraft v. General Instrument Corp.*, D.C., 275 F.Supp. 961, 972.

## V

### *Best Mode*

The patent disclosure is directed to persons skilled in the art and it is only necessary that it be in sufficient terms to appraise such persons of the contemplated *best mode* and that the inventor acted in good faith. Where air pressure is employed to drive the water out of the leg, as grout is introduced to form the initial plug, suffi-

cient air *must* be released to compensate for grout or the grout will be lost out of the bottom. If grout is added to the annulus, less air is required to keep out the water because the grout itself asserts a hydrostatic pressure which combines with the air pressure to provide the total pressure in the annulus.[27] However, some air must be maintained in the annulus while grout is being introduced to keep the water out until the grout column by itself can do so. RE 28,232 recognizes that the condition of air pressure must so vary because it states [28] that after water has been expelled by the air pressure, and while grout is being introduced, the air pressure is controlled by a valve and monitored by a gauge to produce a static air pressure sufficient to prevent ingress of sea water through the lower end of the jacket leg.[29]

## VI

### *Joint Inventors*

The Court finds that Bassett and Olsen are joint inventors of the RE 28,232 patent. The constraint feature and the use of a vibrator were sole contributions of Olsen. Although it is clear that Olsen's contribution would not work independently of Bassett's, the contribution among joint inventors does not have to be equal. A person who merely followed the instructions of another in performing experiments is not a joint inventor, but a person who plays at least some role in the final conception of that which is sought to be patented, is a joint inventor. Further, this defense is technical, has been looked upon with disfavor by the Courts, and clear and convincing proof is required to sustain it. *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357 (E.D.Pa.1972), aff'd 487 F.2d 1395 (3rd Cir. 1973).

---

**26.** Several other patents including Blount, were cited by the examiner but the evidence is clear that Evans is more pertinent. Blount deals with the conventional method of grouting in two stages with the introduction of grout near the bottom of the annulus in the presence of water. Further, a utilization of all the prior art taken together would not complete the puzzle

and disclose the Bassett and Olsen method of air pressure grouting.

**27.** Bassett, TR 113; Gambrell TR 569–570.

**28.** PX 1, Col. 2, Line 63 to Col. 3, Line 3.

**29.** PX 1.

■ There is no evidence of deceptive intent, nor advantage to the plaintiffs due to the addition of Olsen to the patent.[30] Since the Court finds that Bassett and Olsen are joint inventors, there is no misjoinder, and even if there were, it would be technical, by error and without intent to deceive anyone and is subject to correction by the Court, pursuant to § 256.[31]

■ It is true that in earlier litigation in 1974, Bassett asserted that he "alone"—as opposed to Bassett and Olsen, conceived and reduced to practice, the subject matter of these claims. Although this admission is entitled to some weight, it must yield to better evidence. What is known to be true by the weight of the evidence cannot be tossed aside because of what was said or alleged in a former proceeding for the purpose of presenting a classical patent defense.

■ Defendants assert that since Bassett conceived and reduced to practice, in 1968–1969, the subject matter of the fifteen claims involved before any date ascribed to Bassett and Olsen, the Court should render those claims invalid. A man's own work cannot be used against him except in time bar under § 102(b). Technically speaking, Bassett is "another" in relation to the co-inventive entity of Bassett and Olsen. Therefore, if the earlier invention by Bassett alone was such an encroachment upon the field that what is left is too little by way of creative advance by Bassett and Olsen, then there can be no patentable invention. The Court, after due deliberation, concludes that this is not the case. The Court will not invalidate the patent in suit on the basis of § 102(a) [32] since it appears to be a sufficient advancement over the prior work of Bassett to constitute "invention" by Bassett and Olsen.

## VII

### The Remaining Defenses

■ Defendants claim that the patent is void under 35 U.S.C. § 102(f) for not naming the true inventor in that a third individual, James Ratteree, conceived the idea independently of Bassett and Olsen of reducing air pressure in the annulus as grout is added, in order to compensate for the buildup of grout pressure. Ratteree knew noth-

---

**30.** An example of deceptive intent is illustrated in *Iron Ore Company of Canada v. Dow Chemical Co.*, 177 U.S.P.Q. 34 (D. Utah), wherein a party the court found not to have made any "actual or substantial contribution to the inventive concept" was falsely named as a co-inventor with the actual and sole inventor who was under contract with the University of Utah. The court found that the purpose of the named joint intervention was to defraud the University out of any possible claim to the invention to permit it to be privately exploited. This was held to be "deceptive intent".

**31.** 35 U.S.C. § 256:

"Whenever a patent is issued on the application of persons as joint inventors and it appears that one of such persons was not in fact a joint inventor, and that he was included as a joint inventor by error and without any deceptive intention, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate deleting the name of the erroneously joined person from the patent.

"Whenever a patent is issued and it appears that a person was a joint inventor, but was omitted by error and without deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate adding his name to the patent as a joint inventor.

"The misjoinder or nonjoinder of joint inventors shall not invalidate a patent, if such error can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly."

**32.** There appear to be no cases in point. For cases involving rejections when the invention was described in a patent to another filed before the invention thereof by the applicant for a patent and particularly, cases decided under § 102(e), see *Kendall Co. v. Tetley Tea Co.*, 189 F.2d 558 (1st Cir., 1951); *Application of Land*, 368 F.2d 866 (Cust.Pat.App., 1966); *In re Blout*, 333 F.2d 928 (Cust.Pat.App., 1964); *Alexander Milburn Company v. Davis-Bournonville*, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926). Had Bassett been the sole inventor, the Court, under § 256 as previously noted, could delete Olsen, and clearly in that case, Bassett's early work would not be prior art against his own invention.

ing about air pressure grouting until contacted by Bassett[33] and Ratteree admitted that Bassett first told him about air pressure grouting.[34] Once Bassett made his invention known, the task of putting the air reducing feature to use was as easy as falling off a log.[35]

Defendants urge that the patent claims relate only to a nonvented system. However, the valve 21, shown in Figure 2 of the reissue patent, can function as a vent when the air hose is detached.[36] Professor Gambrell testified that the valve was a two-way valve, through which air could be injected or released during grouting operations.[37]

Figure 2
Plaintiff Exhibit 1

Further, the defense that "static" pressure in the claims means that air pressure is always constant and not reduced as grout is added, is ill-founded. The Court accepts "static" as used herein to mean the pressure in the annulus at any point of time when you take a reading from the gauge which will change as grout is introduced and air pressure is released.[38]

The invention includes the concept of releasing air pressure even though the words "releasing" or "bleed off" are not used. The word "controlled" covers the reduction of air pressure when grout is introduced. Control of air pressure necessarily means reduction of air pressure because the only way this job can be accomplished and sea water prevented from returning to the annulus is by reducing air pressure as grout is added. This is disclosed by Claim 12, which states, ". . . controlling the gas pressure to maintain a static gas pressure sufficient to prevent ingress of sea water . . ", while, ". . . introducing an initial fill . . . ."[39]

The defense of prior knowledge and use of air pressure grouting by the defendants in 1966, is not supported by the evidence. The evidence is based strictly on the oral testimony of employees of the defendants, Brown and Root. Defendants attempt to justify their present infringement by claiming that they performed air pressure grouting jobs on two legs of an eight leg Gulf Oil platform in 1966, at West Delta Block 117C. Gulf Oil, the company for whom the job was done, has no knowledge or record of the procedure being used[40] and W. W. Frazier, the manager of the offshore division of defendant, Brown and Root, does not contend that Gulf ever knew of the alleged use. The Gulf representative on the job kept a record of the grouting procedures used and there is no notation of any air pressure grouting procedure.[41]

Further, an on-site inspection failed to establish that the air pressure grouting procedure was actually used,[42] and Frazier acknowledged that there was no way to determine by inspecting the platform today, how it was grouted.[43]

33. Bassett TR 135–139.

34. Bassett TR 131, 132, 145, PX 143A, Ratteree Dep. DX 45, at Page 73.

35. Frey TR 454–455; Tannahill DX 46.

36. Frey TR 496–497.

37. TR 574.

38. TR 236–237, 488, 503–504, 593–594, 607.

39. See Claim 12, c. and d., supra (P. 12).

40. Frazier TR 778.

41. DX 11.

42. Frazier TR 788, 789; Stockton DX 43, at Pages 34, 36 and 43.

43. Frazier TR 788.

■ As previously stated, the alleged prior use of air pressure grouting by defendants is not prior art under 35 U.S.C. § 102. The key factor is if Brown and Root used this method in 1966, why did it wait eleven years until 1977, to use it again. In the interim, they made no record of it and told no one about it. This Court will not invalidate an otherwise valid patent on the basis of oral testimony alone. *Zachos v. Sherwin Williams*, 177 F.2d 762 (5th Cir. 1949); *Kiva Corporation v. Baker Oil Tools, Inc.*, 5th Cir., 412 F.2d 546.[44]

Further, the Court is not impressed with the defense that since the defendants did not perform the sealing step, they did not infringe. The sealing step, although not an inventive one, must exist to perform the substance of the invention. The issue is whether the patent teaches one to expel water from the lower end of the annulus and then fill the annulus from the top with grouting material.

## VIII

### Infringement

The plaintiffs' evidence to establish infringement consisted of four (4) different grouting jobs. Plaintiff conceded that the evidence on one job, Cities Service, is inconclusive and therefore, the Court will consider the remaining three, *Freeport Sulphur* (1977), *Marathon* (1977), and *Mobil Oil* (1978).

With respect to the Freeport Sulphur and Marathon jobs, the evidence shows that all of the steps of the grouting method described in Claims 1 and 12 were used by the defendants and that the procedures were substantially the same in means, operation

and result as those specified in Claims 1 and 12 of RE 28,232.[45]

On Freeport, the actual grouting operation was conducted by Halliburton which was assisted by Brown and Root employees on the platform.[46] On Marathon, Halliburton again performed the grouting operations and the employees of Brown and Root who were on the platform assisted by controlling and bleeding off the air pressure as Halliburton pumped grout.[47] At least one of the legs of each platform was grouted successfully using the procedures of RE 28,-232.[48]

On Mobil, the annulus was welded and sealed at the top but there is no evidence that this step was performed by either of the defendants (Brown and Root had performed this step on the Freeport Sulphur and Marathon jobs). However, the grouting procedure· performed by Halliburton was substantially that described in Claims 1 and 12 of RE 28,232[49] which resulted in a successful grouting job,[50] and the testimony of plaintiffs' expert witnesses support the conclusion that the Freeport, Marathon and Mobil jobs employed the same mode of operation to accomplish the same result as provided for by the patented method.[51] On this issue, the defendants offered no evidence to create a serious dispute.

■ Direct infringement arises if a patented invention is made, used or sold without permission of the patent owner. 35 U.S.C. § 271(a). In deciding whether a patented method has been used so that infringement exists, the patent claims and the accused method must be examined to determine, first, whether the claims literally describe the accused method (literal in-

44. In *Kiva*, the Court found sufficient corroboration for oral testimony of a prior use because there was evidence in the form of the tools of the type in question and job tickets indicating that the witnesses had done a job with the tools. The witness was also a disinterested party.

45. TR 457–464, 591–596, 602–603, 606, 723, 740.

46. PX 97, Vol. 1, Page 68; PX 99, Pages 25–36, 40; PX 100, Pages 18, 25.

47. PX 98, Vol. 11, Pages 15–16, 26, 30, 37.

48. TR 346–371, PX 124, PX 3A, 3B, 20 and 21; and TR 375–389, PX 125, PX 16–19, and PX 5053.

49. Moore DX 97.

50. TR 389–409, PX 126, PX 4–11, 19.

51. Fry TR 456–473, 499, 503; Gambrell TR 586–612.

fringement) and, second, whether the accused method is substantially the same in means, operation and result as the patented method. *Ziegler v. Phillips Petroleum Company*, 5th Cir., 483 F.2d 858. One who actually induces infringement of a patent is also liable as an infringer. 35 U.S.C. § 271 (b). There must be direct infringement to have induced infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). When infringement results from the participation and combined action of several parties, they are all joint infringers and jointly liable for patent infringement. *New Jersey Patent Co. v. Schaeffer*, 159 F. 171 (E.D.Pa. 1908), aff'd 178 F. 276 (3rd Cir. 1909). Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method. *Metal Film Company v. Milton Corporation*, 316 F.Supp. 96 (S.D.N.Y.1970). Even though the general rule is that the omission of an element or step of a patented device or method avoids infringement, infringement can, nevertheless, be found under the doctrine of equivalents if the device or method used is substantially the same in means, operation and result as the patented device or method. *Gaddis v. Calgon Corporation*, 506 F.2d 880 (5th Cir. 1975). Infringement is not avoided where the patent teachings are not followed exactly, *"so long as the substance of the invention is appropriated by the accused device."* *Abbott v. Barrentine Manufacturing Company*, 255 F.Supp. 890 (N.D.Miss.1965).

The Court finds that Claims 1 and 12 of United States Letters Patent No. RE 28,232 have been singularly and jointly infringed by defendants on the Freeport, Marathon and Mobil jobs. The Court, however, does not find induced infringement on the Mobil job.

IX

*Claim 10 of U.S. Patent Number 3,832,857*

The final question to be decided is whether or not U.S. Patent No. 3,832,857 is invalid. Claim 10 reads as follows:

"10. A method of grouting an offshore structure having at least one supporting leg including

a tubular jacket extending downwardly from above the waterline to the sea bed and a piling driven through said jacket into the sea bed with an annular space existing between the inside of the jacket and said piling, said annular space being closed at its upper end and open to the sea bed at its lower end, said method comprising the steps of

applying air under pressure to said annular space to force water therein out the lower end, thereby reaching an air pressure in said annular space sufficient to overcome the pressure head of the overlying sea water,

flowing fluid grouting material down through said annular space to the lower end, while gradually reducing air pressure to compensate for the pressure head exerted by the grouting material, until sufficient grouting material is in the annular space to overcome the pressure head of the overlying sea water without the use of any air pressure,

flowing an additional amount of fluid grouting material into said annular space, whereby fluid grouting material is forced out the bottom of the annular space, and allowing the grouting material to set up."

Plaintiffs believe that 3,832,857 is an improvement over the basic procedure of the RE 28,232 patent. When put to use, grout will flow out the bottom of the leg to insure that no water is in the leg as the grout sets up. This is accomplished by adding an additional amount of grout in the annulus *after* an initial plug of grout, sufficient, by itself, to keep water out, without air pressure, is placed in the annulus and after air pressure has been removed. In the event some water may have gotten into the leg bottom during placement of the initial plug, the excess grout will generally push the grout in the leg down and thus push water and eventually some grout out of the lower end of the annulus to insure that no water is in the leg as the grout sets up. Plaintiffs refer to this method as overdisplacement.

**1390**

Plaintiffs claim this overdisplacement method is distinguished from the procedure involved in the RE 28,232 patent in which grout is pushed out the bottom of the leg *during* the placement of the initial plug, by "overpressuring" with air. The Court disagrees. The plaintiffs have drawn too fine a line. Whether grout is forced out the bottom by air or forced out the bottom by more grout, the purpose is to dewater and grout the annulus. The question of the validity and enforceability of Claim 10 of United States Letters Patent No. 3,832,857 is rather obvious in the Court's opinion. Considering the Prior Art and the level of skill of persons skilled in the art at the time of this invention, the Court finds that the requisites for a valid patent are not present and that U. S. Patent No. 3,832,857 is invalid and unenforceable.

## X

### Conclusion

This Court has jurisdiction over the subject matter of this cause and the parties, and venue is proper in this Court.

Plaintiff, C. Nelson Shields, is the legal owner of U.S. Letters Patent Numbers RE 28,232 and 3,832,857, and plaintiff, Advance Engineering, Inc., is the exclusive licensee of said patents. Plaintiffs, representing full right, title and interest in and to said patents, have the right to bring this action and to recover damages for infringement of said patent if such be found by this Court.

The Bassett and Olsen disclosure was sufficient to enable one skilled in the art to make and use the invention and even though Bassett and Olsen might have more elaborately or differently stated it, it complied with the statute. Claims 1 and 12 of RE 28,232 clearly disclose and cover an air pressure grouting operation which includes the step of releasing air pressure where a person skilled in the art could use the invention without "undue experimentation". *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, 304 F.Supp. 357 (S.D.N.Y.1969), aff'd. 433 F.2d 1034 (2nd Cir. 1970); *Ansul*

*Co. v. Uniroyal, Inc.*, 448 F.2d 872 (2nd Cir. 1971). Therein, the Court stated at page 878:

> " '(a)n inventor who discovers a basic new use is not required specifically to disclose, or even be aware of, all of the uses of his invention.' * * *
>
> * * * * * *
>
> " ' . . . the necessity for conducting experimentation or preliminary tests to determine the successful application of an invention * * * will not invalidate a patent, provided one skilled in the art could determine and select the necessary experiments or tests without unreasonable difficulty.' " * * *

The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to obtain the particular results desired does not make the claims indefinite, or the disclosure inadequate. *Lever Bros. Co. v. Proctor & Gamble Mfg. Co.*, 139 F.2d 633 (4th Cir. 1943); *Acme Highway Products Corp. v. D. S. Brown Company*, 431 F.2d 1074, 1080 (6th Cir. 1970). A patent is not invalid even though some trial and error is required to make it work. *Gray Company v. Spee-Flow Manufacturing Corporation*, 361 F.2d 489 (5th Cir. 1966).

The fact that each of the steps of the Bassett and Olsen patent might have been evident in the prior art is one thing but to combine them into a workable method is another. Even then, the invention met with considerable industry resistance. The dictionary, a mere book of words, contains the great novels of the future which will appear only when those words are combined to create a great work by those skilled in the art.

The Bassett and Olsen invention, RE 28,232, is, in the Court's opinion, a pioneer patent directed to the only effective method to grout the legs of an offshore platform without the use of grout lines, packers and divers. When the Court is confronted with a pioneer patent,[52] liberality becomes the keynote of construction re-

---

**52.** *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858 (5th Cir. 1973). A pioneer patent is a patent covering a function never before per-

formed, a wholly novel device as distinguished from a mere improvement or perfection of what had gone before.

quiring the Court to give the patentee a wide breadth of protection in construing the patent claims and specifications. The Court finds that the Bassett-Olsen Patent RE 28,232 is valid and enforceable and it has been infringed by defendants.

Plaintiffs are entitled to an injunction restraining each of the defendants from further infringement of United States Letters Patent 28,232, and to an accounting for damages up to the date of the entry of the judgment, including a determination at such an accounting of whether defendants' infringement was willful and whether this is an exceptional case entitling plaintiffs to an award of attorney's fees.

Plaintiffs are hereby ordered to submit a judgment conforming to this opinion, within ten (10) days of this date, and serve a copy on opposing counsel who will file any objections in writing with the Court within ten (10) days of receipt of same.