GENERAL MOTORS CORPORATION,
Plaintiff-Appellant Cross-Appellee,

v.

TOYOTA MOTOR COMPANY, LTD., Toyota Motor Sales Company, Ltd., and Mid-Eastern Toyota Distributors, Inc., Defendants-Appellees Cross-Appellants.

Nos. 79–3219, 79–3220.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1980.

Decided Dec. 3, 1981.

Certiorari Denied April 19, 1982.
See 102 S.Ct. 1994.

Gilbert Henderson, Biebel, French & Nauman, Dayton, Ohio, Frederick M. Ritchie, George E. Frost, Detroit, Mich., for plaintiff-appellant cross-appellee.

Paul J. Winterhalter, Pickrel, Schaeffer & Ebeling, Dayton, Ohio, Hugh A. Chapin, Kenyon & Kenyon, Edward W. Greason, Arthur D. Gray, New York City, for defendants-appellees cross-appellants.

Before WEICK and ENGEL, Circuit Judges, and PECK, Senior Circuit Judge.

PECK, Senior Circuit Judge.

The primary issue on appeal is the correctness of the trial court's conclusion that claims five through eight of General Motors' patent on a type of catalytic converter are invalid, under 35 U.S.C. § 103, for obviousness.

General Motors (GM) sued Toyota alleging infringement of U.S. Patent number 3,852,041 ("the '041 patent"). Toyota counterclaimed that the patent was invalid and sought a declaration of that invalidity, as well as attorneys' fees. The district court's pretrial order limited triable issues of infringement to claims five through eight of the patent in suit. As noted, the district court found these claims to be obvious in light of prior art. *See General Motors Corp. v. Toyota Motor Co., Ltd.*, 467 F.Supp. 1142, 1177 (S.D.Ohio 1979).

The district court's findings of fact have been published and need not be recapitulated here. It is enough to note that GM, through three named inventors, patented an efficient catalytic converter with a basic configuration shown in the appendix to this opinion. GM contends that this converter meets the harsh requirements of heating rapidly to the 250° F temperature needed for catalyst efficiency, while remaining undamaged by the much higher temperatures (over 1500° F) to which a converter is sometimes exposed. Further, the converter is purportedly inexpensive to produce, does not allow exhaust fumes to bypass the cleansing catalyst, and does not leak exhaust gases to the atmosphere.

There are three legal requisites to a valid patent: utility, novelty, and non-obviousness. The utility of an effective catalytic converter is not questioned in this case. The district court concluded, and we agree, that the patented device was novel. See 467 F.Supp. at 1170. If the district court erred in concluding that the patent in suit is obvious, then the patent is valid.

In patent litigation, separating matters of fact from matters of law for purposes of appellate review is about as easy as unscrambling eggs. Concerning conclusions of obviousness under § 103, the Supreme Court has written that

While the ultimate question of patent validity is one of law, *A. & P. Tea Co. v. Supermarket Corp., supra*, [340 U.S.] at 155 [71 S.Ct. at 131], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966).

This Court has interpreted this language to mean that the "several basic factual inquiries" are subject to the "clearly erroneous" standard of review of Fed.R.Civ.Pro. 52(a), while the ultimate conclusion of obviousness is one of law, with which this Court may freely disagree if the facts as found or the law as applied do not support the legal conclusion reached by the trial court. *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 619 (6th Cir. 1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); *Reynolds Metals Co. v. Acorn Bldg. Components, Inc.*, 548 F.2d 155, 161 (6th Cir. 1977); *Philips Indus., Inc. v. State Stove & Mfg. Co.*, 522 F.2d 1137, 1139 (6th Cir. 1975); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 81 (6th Cir.), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). *See Universal Electric Co. v. A. O. Smith Corp.*, 643 F.2d 1240 at 1246 (6th Cir. 1981). *But see Smith v. Acme General Corp.*, 614 F.2d 1086, 1092 (6th Cir. 1980), which might be interpreted

as implying that district courts' conclusions on obviousness of inventions must be affirmed if the courts' preliminary fact-findings are not clearly erroneous. We disapprove such a reading.

The district court, after making the factual inquiries noted in *Graham*, concluded "that a person of ordinary skill in the art would have been induced by his penchant for streamlining to apply the teachings of British [patent number 632,013] to the CM–714 and make the top retainer plate of the CM–714 identical to the bottom retainer plate." 467 F.Supp. at 1175. From this the district court concluded that the disputed claims of the patent in suit were invalid for obviousness. *Id.* at 1176–77.

■ The difficult questions on appeal concern the propriety of considering the CM–714, a catalytic converter developed "in-house" at GM, to be disabling prior art. Although the matter of the "scope and content" of prior art is, under *Graham*, a factual inquiry, what may properly be considered prior art must in part be a question of law when issues of joint invention are raised. The district court took cognizance of this when it noted the following rules of law:

> If several persons collaborate to produce a joint invention, the conceptions and inventions of one of them will be assimilated into the joint invention only if those conceptions and inventions were generated by the collaborative effort which produced the joint invention. Therefore a conception or invention which is developed by a joint inventor before commencement of the collaborative effort never can be treated as the conception of a joint invention or as a joint invention because it is not the result of a collaborative effort to produce a joint invention. However, if the prior conception or invention is modified as a result of a collaborative effort, the modified conception or invention may become the conception of a joint invention or a joint invention.

1. The district court found that the CM–714 was conceived solely by Banyas and Jalbing, two GM employees, but that Moore, another GM employee, "also should be given some credit

467 F.Supp. at 1162–63 (footnotes omitted). It is this last sentence that best states the law of joint invention in this Circuit. *See Vrooman v. Penhollow*, 179 F. 296, 308 (6th Cir. 1910).

■ The patented converter was developed at GM by at least three stages:

| STAGE | "INVENTORS" AS FOUND BY TRIAL COURT |
|---|---|
| CM-474 sketch | Moore |
| CM-714 | Banyas, Jalbing, [Moore][1] |
| '014 patent | Moore, Foster, Haggart (patentees) |

On appeal, GM argues, in essence, that there was only one invention, the patented converter, and that the two earlier steps in its development should be seen as merging into the final product. Put another way, GM contends that the patented converter is a "joint invention" of most or all of the above GM employees, and that an intermediate step by a subset of this inventive group should not be considered disabling prior art. Toyota argues that the three steps are discrete inventions because the first two steps did not result from the collaboration of the patentees.

GM's argument has the virtue of realism—it provides an accurate description of the manner of the patented converter's invention. The '041 converter's creation was not at the hands of lone-eagle inventors who occasionally flocked together to exchange ideas, but was the product of a concerted effort underwritten and directed by GM.

Toyota's argument that the prior in-house development must be considered disabling prior art is based largely on *Application of Land*, 368 F.2d 866, 881 (C.C.P.A.1966), and *Application of Bass*, 474 F.2d 1276, 1288 (C.C.P.A.1973), where prior sole inventions of one joint inventor were held to be prior art to the later joint inventions. Neither *Land* nor *Bass* indicates that the prior inventions were in any way the product of

for the CM–714 converter since it was derived from the CM–474 sketch." Thus, Moore participated at least indirectly in all three steps.

concerted effort within a business entity. Under the facts of this case, where numerous "inventors" all worked under the aegis of one employer toward a common goal, it is appropriate to define the concept of joint invention broadly. It is not realistic to require in such circumstances that joint inventors work side-by-side, and that each step in the inventive process be taken by all the firm's collaborators. *Cf. Hobbs v. United States Atomic Energy Commission*, 451 F.2d 849, 865 (5th Cir. 1971) (per Wisdom, J.):

> Persons employed, as much as employers, are entitled to their own independent inventions, but where the employer has conceived the plan of an invention and is engaged in experiments to perfect it, no suggestions from an *employe*, not amounting to a new method or arrangement, which, in itself is a complete invention, is sufficient to deprive the employer of the exclusive property in the perfected improvement. But where the suggestions go to make up a complete and perfect machine, embracing the substance of all that is embodied in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real invention or discovery belonged to another.

For the reasons outlined above, the CM–714 should not be seen as a "complete invention" sufficient to deprive the named inventors (or GM as their assignee) of the "exclusive property in the perfected improvement."

■ Toyota's response to GM's joint invention arguments amounts to no more than raising as a defense to GM's infringement allegation the non-joinder of Banyas and Jalbing as coinventors in the patent application. Such defenses are highly technical; courts disfavor these defenses on the strength of the legal presumption that the inventors named in a patent are the true ones. *See Jamesbury Corp. v. United States*, 518 F.2d 1384, 1395 (Ct.Cl.1975);

*Garrett Corp. v. United States*, 422 F.2d 874, 880–81 (Ct.Cl.), *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1385 (W.D.La.1980). This presumption is only overcome by clear and convincing evidence. *Garrett, supra*, 422 F.2d at 880–81; *Shields, supra*, 493 F.Supp. at 1385. Toyota has not produced clear and convincing evidence that the contributions of the unnamed "inventors" were any more than improvements on Moore's concept.[2]

Toyota has argued against an expansive definition of "joint invention" in the context of corporate in-house developments, stating that such a reading would bring an "elasticity" to statutory patent law that Congress did not put there. There are two answers to this argument: first, 35 U.S.C. § 103, the statutory ground for invalidating the patent in suit, is but a codification of prior judicial practice. *Graham, supra*, 383 U.S. at 3–4, 86 S.Ct. at 686–87. In such circumstances, it would be mindless to reach irrational or inequitable results out of supposed fidelity to statutory language. Second, § 103 ends with the sentence "[p]atentability shall not be negatived by the manner in which the invention was made." Toyota would have us create extra barriers to the patenting of "in-house" developments.

■ An alternative ground for holding claims five through eight of GM's patent valid is that the district court erred in holding that GM's sales of the CM–714 were beyond the "experimental use" exception to the rule that sale of an invention is public disclosure of that invention. Certainly the CM–714 cannot be said to have rendered the patented converter obvious if the CM–714 was effectively disclosed only to the coinventors of the patent.

The district court found that GM's sales of the CM–714 converter to International Harvester and to American Motors were under the condition that the sales were made primarily for experimental use. 467

2. The district court found that Toyota had produced clear and convincing evidence of the patented converter's obviousness, but the court did so only by erroneously considering the CM–714 prior art. See 467 F.Supp. at 1175–77.

F.Supp. at 1166–67. But the trial court also found that the experiments conducted by International Harvester "concerned converter emission performance, converter placement, and cooling loop routing," rather than catalyst housing durability, a problem that the patented invention purports to solve. This overlooks the return of converters to GM by International Harvester for GM to determine how well the converters held up.[3] The district court did not find that GM's sales were for other than experimental purposes, but, we believe, too narrowly limited the experimental purposes that may fit the "experimental use" exception. GM has carried its burden of proving that the CM–714's sold were "substantially used for experimentation or testing purposes." *Dunlop Co. Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413–14 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974) (*quoting F.M.C. Corp. v. F. E. Myers & Bro. Co.*, 384 F.2d 4, 10 (6th Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)). For this reason also, we hold that the trial court erred in classing the CM–714 as disabling prior art.[4]

In drawing its conclusion that the '041 patent was invalid for obviousness, the district court adverted not only to the CM–714 as prior art, but also to the British '013 patent. The court, however, found that British '013, a patented muffler, rendered GM's patented converter obvious only when the '013's teachings were applied to the CM–714. Since the CM–714 was improperly classed as prior art, the British '013 does not itself render the patented invention obvious.

For these reasons, GM's failure to list the CM–714 and the British '013 as prior art in its patent application does not present the "exceptional circumstances" allowing an award of attorneys' fees under 35 U.S.C. § 285. The district court did not abuse its discretion in refusing to grant attorneys' fees to Toyota.

The trial court's judgment holding claims four through eight of the patent in suit invalid is reversed, and the case remanded for trial of the question of infringement. The district court's judgment refusing attorneys' fees to Toyota is affirmed.

No costs to be taxed in this Court; each party shall bear its own costs on appeal.

### APPENDIX

*Relevant Elements Of Patented Converter*

---

**3.** GM agents asked International Harvester not to expose the converters to temperatures over 1500° F; this limit was in fact inadvertently exceeded. Exhibit 43 at H00040. Although Toyota makes much of mention of converter durability at temperatures "up to about 1600° F" in the patent application, none of the claims at issue mentions this figure. In any event, this 6% deviation does not change GM's purpose in making the sales—to acquire information relevant to the invention from the buyers' testing.

**4.** The district court also found that GM touted the CM–714 on Detroit television and before an American Petroleum Institute meeting. The court did not find this to be a legally significant disclosure, nor did it find that technical details of the CM–714 were disclosed.

PLAN VIEW

CROSS-SECTION ON 2-2

INLET END ON 3-3            OUTLET END ON 4-4

RELEVANT ELEMENTS OF PATENTED CONVERTER

OUTLET

UPPER CATALYST-RETAINING (INTERMEDIATE) PLATE

LOWER CATALYST-RETAINING (INTERMEDIATE) PLATE

UPPER HOUSING (TOP) PLATE

LOWER HOUSING (BOTTOM) PLATE

RELEVANT ELEMENTS OF PATENTED CONVERTER

INLET