ETHICON, INC. and Inbae
Yoon, M.D., Plaintiffs,

v.

UNITED STATES SURGICAL
CORPORATION,
Defendant,

and

Young Jae Choi, Intervenor–Defendant.

No. 5:89CV00386 (RNC).

United States District Court,
D. Connecticut.

Sept. 9, 1996.

**1018**

Kaare Phillips, Grais & Phillips, New York City, Special Master.

Richard S. Lipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, CT, Thomas W. Pippert, Richard H. Savage, David F. Dobbins, Jeffrey I.D. Lewis, Kim Sweet, John M. DiMatteo, Erik Haas, Patterson, Belknap, Webb & Tyler, New York City, Eric Harris, Harman A. Grossman, Johnson & Johnson, New Brunswick, NJ, Dion W. Moore, Elizabeth Jane McBride, Peter D. Clark, Williams, Cooney & Sheehy, Bridgeport, CT, for plaintiff Ethicon, Inc.

Paul F. Thomas, Jacob D. Zeldes, Frank J. Silvestri, Jr., Zeldes, Needle & Cooper, Bridgeport, CT, Theresa M. Gillis, Jones, Day, Reavis & Pogue, New York City, Eric J. Lobenfeld, Chadbourne & Parke, New York City, Clark E. Walter, Valerie A. Cohen, J. Paul McGrath, Bradford J. Badke, Harvey Kurzweil, Dewey Ballantine, New York City, Sanford M. Litvack, The Walt Disney Company, Burbank, CA, Beverly Stauffer Knapp, Westport, CT, for defendant U.S. Surgical Corp.

Richard S. Lipman, Schatz & Schatz, Ribicoff & Kotkin, Hartford, CT, Thomas W. Pippert, Richard H. Savage, David F. Dobbins, Jeffrey I.D. Lewis, Kim Sweet, John M. DiMatteo, Erik Haas, Patterson, Belknap, Webb & Tyler, New York City, Eric Harris, Harman A. Grossman, Johnson & Johnson, New Brunswick, NJ, Dion W. Moore, Elizabeth Jane McBride, Peter D. Clark, Williams, Cooney & Sheehy, Bridgeport, CT, Patrick E. Gonya, Jr., Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, FL, for plaintiff Inbae Yoon.

### RULING ON DEFENDANTS' MOTION TO CORRECT INVENTORSHIP

CHATIGNY, District Judge.

This is a patent infringement case brought by Inbae Yoon, M.D., the sole inventor named in the patent, and his exclusive licensee, Ethicon, Inc., against defendant United States Surgical Corporation. The case is before me on a motion by U.S. Surgical and intervenor-defendant Young Jae Choi to correct the patent to add Choi as a coinventor pursuant to 35 U.S.C. § 256. Alternatively, U.S. Surgical seeks a declaration that the patent is unenforceable due to inequitable conduct before the Patent and Trademark Office.[1]

A lengthy evidentiary hearing has been held on the numerous factual issues presented by the parties' inventorship dispute. See *Ethicon, Inc. v. United States Surgical Corp.*, 921 F.Supp. 901 (D.Conn.1995) (holding that plaintiffs not entitled to jury trial). Proposed findings of fact and conclusions of law have been submitted by the parties, along with post-hearing briefs.

Courts are reluctant to order correction of the inventorship of patents, especially when misjoinder or nonjoinder of inventors is raised in response to an infringement claim. Nevertheless, after careful consideration of all the evidence presented by both sides, I find that Choi is a coinventor of the subject matter of two claims of the patent, that section 256 permits correction of the patent to add him as a coinventor and that Choi is not barred from obtaining correction of the patent by laches or equitable estoppel.

### I. *Background*

The patent in question is United States Patent No. 4,535,773 (the '773 patent), entitled "Safety Puncturing Instrument And Method." The patent claims surgical puncturing instruments, known as "trocars," with certain mechanical and electronic components designed to reduce the danger to patients posed by use of conventional trocars.

---

1. U.S. Surgical contends that Yoon engaged in inequitable conduct before the PTO by falsely swearing that he is the sole inventor of the sub- ject matter of the patent and by failing to disclose Choi as a coinventor.

The parties refer to the instruments claimed in the patent as "safety trocars."

In June 1989, Yoon and Ethicon commenced this action against U.S. Surgical alleging infringement of claims 34 and 50 of the '773 patent. At a deposition in April 1990, Yoon was shown a handwritten document dated August 20, 1975, entitled "Flow Chart of the Procedure," relating to use of a "safety trocar system." DX 29.[2] See USSC's October 15, 1992 Motion to Correct Inventorship, Appendix 1, Ex. 3, pp. 112–117. Yoon testified that the document had been prepared in part by Choi, whom he described as an "electric technician" with "expertise in sensor[s]," during a trip Yoon made to South Korea in 1975. Yoon testified that he planned to hire Choi but never did. Asked whether Choi did any work for him, Yoon answered, "Some of the sensor area, but was discussing [sic] stage." Asked whether Choi did anything "relating to trocars," Yoon replied, "No, no."

In mid–1992, counsel for U.S. Surgical contacted Choi regarding his involvement with Yoon and safety trocars. Discussions between U.S. Surgical's counsel and Choi led to an agreement dated September 3, 1992. DX 123. In that agreement, Choi granted U.S. Surgical an exclusive license to practice his "trocar related inventions"; authorized U.S. Surgical to bring an action to correct the patent to add him as a coinventor; promised to assist U.S. Surgical in connection with the action by providing information and testimony; and agreed to join the action as a party. U.S. Surgical agreed to pay Choi $300,000 on execution of the agreement and make future payments to him of up to $1 million contingent on the outcome of the litigation.

On October 15, 1992, U.S. Surgical filed the instant motion seeking correction of the inventorship of the patent. U.S. Surgical and Choi contend that Choi is a coinventor of four of the patent's fifty-five claims.

Yoon and Ethicon acknowledge that Choi worked with Yoon on a project that led to issuance of the '773 patent but deny that he is a coinventor. They also argue that Choi should be barred from obtaining correction of the patent because he (1) failed to act with due diligence in asserting his coinventorship claim and (2) caused Yoon to have a reasonable belief that no such claim would ever be presented, which Yoon relied on in entering into his licensing agreement with Ethicon.

To obtain correction of the patent, U.S. Surgical and Choi must prove by clear and convincing evidence that Choi made an inventive contribution to the final conception of the subject matter of at least one claim of the patent.[3] At the hearing, they presented the testimony of the following witnesses: Choi; Yoon; Professor Donald S. Chisum, an expert in patent law; Professor Martin F. Schlecht, an expert in electrical engineering; and Lyndal L. Shaneyfelt, an expert examiner of questioned documents.

Yoon and Ethicon have no burden of proof except with regard to their reliance on the doctrines of laches and equitable estoppel. At the hearing, they presented the testimony of Yoon; Mrs. Yoon; Eph Konigsberg, a manufacturer of biomedical instruments;[4] Robert E. Bushnell, a patent attorney who represented Yoon in connection with obtaining the '773 patent; Tipton D. Jennings, IV, a patent attorney who represented Yoon in certain patent matters in the 1970's and 1980's; Melvin C. Garner, an intellectual property lawyer who is also an electrical engineer; and James R. Glover, a financial planning consultant who assisted Yoon in connection with licensing negotiations involving the '773 patent.

## II. Findings of Fact

### A. The Parties

1. Yoon is a physician specializing in obstetrics and gynecology. He was born in

---

2. "DX" refers to Defendants' Exhibits. Plaintiffs' Exhibits are referred to as "PX." "Y" refers to the Bates stamp numbers of the pages of the exhibits.

3. See *Price v. Symsek,* 988 F.2d 1187, 1190–1194 (Fed.Cir.1993). Evidence is clear and convinc-

ing if it produces an "abiding conviction" that the matter sought to be established is "highly probable." *Id.* at 1191 (citation omitted).

4. Konigsberg testified by videotaped deposition.

South Korea and graduated from medical school there in 1961. He has engaged in private practice in Maryland since 1970 and has worked extensively in the field of endoscopic surgery. He is the sole inventor named in numerous patents relating to devices used in endoscopic surgery.

Yoon has no formal education in electronics or engineering. Since the mid– to late 1970's, he has been aware of the existence of various types of sensors and interested in their potential application in the practice of gynecology. However, he does not understand basic terminology relating to electronics and is incapable of drawing circuits. Mindful of the limited nature of his own knowledge, he has looked for people with expertise in electronics and engineering to assist him in connection with his projects. Prior to meeting Choi, he disclosed no use of electronics in connection with his patented inventions.[5]

2. Ethicon is a New Jersey corporation with a principal place of business in New Jersey. On June 27, 1988, Yoon granted Ethicon an exclusive license under the '773 patent. DX 18, DX 19. Pursuant to the licensing agreement, as amended, Ethicon manufactures and sells a safety trocar. The product has been a commercial success. To date, Ethicon has paid Yoon more than $15 million in royalties in connection with the '773 patent.

3. U.S. Surgical is a Delaware corporation with a principal place of business in Connecticut. It also manufactures and sells a safety trocar.

4. Choi is a resident of Maryland. Like Yoon, he was born and educated in South Korea. He matriculated at a university there for a period of time, taking courses in physics, chemistry and electrical engineering, but did not get a degree. From 1973 to 1979, he held a series of jobs in South Korea working in consumer electronics. In April 1979, he emigrated to the United States.

Since then, he has been employed in a number of different positions involving research and development activities relating primarily to electronic devices. At the time of the hearing, he was self-employed as a consultant. He has never been named the inventor of any patent.

Choi does not have Yoon's credentials as a scientist or inventor. However, he was qualified to collaborate with Yoon in a joint effort to develop a safer trocar because of his training and experience in electronics.

### B. *Surgical Trocars*

5. A trocar is a surgical puncturing instrument used in endoscopic surgery. Endoscopic surgery is a minimally invasive surgical technique whereby access is gained to the interior of an anatomical cavity by one or more small punctures in the cavity wall. Trocars are used in surgery requiring penetration of the wall of the abdomen.

6. Conventional trocars consist of two parts: a hollow tube, referred to as a sleeve; and a cutting element, which consists of a shaft with a sharp cutting tip at one end. To puncture the abdominal wall using a trocar, the surgeon presses the trocar against the patient's abdomen until the cutting tip penetrates the abdominal wall and extends into the abdominal cavity. Once the abdominal wall is punctured in this manner, the surgeon removes the cutting element of the trocar, leaving the sleeve of the trocar as a port into the abdominal cavity through which instruments can be inserted to carry out diagnostic and other procedures.

7. Use of conventional trocars to puncture the abdominal wall can lead to accidental injury. The trocar's cutting tip encounters significant resistance from the abdominal wall until the wall is penetrated. Unless the surgeon stops pushing the cutting tip as soon as the wall is penetrated, the tip will penetrate more deeply, where it can harm internal organs,

---

**5.** In October 1979, shortly before he met Choi, Yoon applied for a patent that later issued as U.S. Patent No. 4,254,762 (DX 3) ('762 patent). One of the purposes of the invention claimed in the '762 patent is to provide a "signal at the completion of the puncture of the wall of the

body cavity by the trocar means." DX 3, Col. 2 and Claim 1. Unlike the patent at issue in this case, which describes sensors and electronic networks for the purpose of providing such a signal, the '762 patent discloses no sensors or electronics.

blood vessels and other anatomical structures.

## C. *Chronology*

### a. **The 1978 Yoon–Konigsberg Meeting**

8. Sometime in the 1970's, Yoon undertook to develop a surgical trocar that would reduce the risk of injury to patients associated with conventional trocars.

9. In 1978, Yoon met with Eph Konisberg concerning commercial development of a device for monitoring dilation of the cervix during labor. Konigsberg's company specializes in manufacturing miniaturized sensors for use in biomedical devices. Yoon was interested in finding out whether Konigsberg could make a miniature sensor that could be affixed to the cervix.[6]

10. During his meeting with Konigsberg, Yoon raised the subject of using miniature strain gauges on surgical trocars. PX 521, 24–25. A strain gauge is a type of pressure sensor that can be used to detect changes in the condition of the object to which it is attached. Yoon showed Konigsberg drawings of trocars with strain gauges.

11. During a videotaped deposition in this case, Konigsberg drew the trocars disclosed to him by Yoon in 1978. PX 511. One is a "safety shielded trocar" that has strain gauges on the "shield." [7] The other trocar has no shield but does have strain gauges on the cutting tip.

12. Based on Konigsberg's videotaped testimony, which I credit, I find that by 1978 Yoon had conceived of (a) the general idea of using pressure sensors in the cutting tip of a trocar as a means of monitoring the position of the cutting tip relative to the abdominal wall; and (b) the general idea of using sensors to monitor the movement of the shield of a safety shielded trocar.

13. In connection with his meeting with Konigsberg, Yoon prepared a handwritten document listing and describing various projects he had in mind in 1978. PX 391. The document includes the following entry:

> Project 3—Yoon Safety Trocar System with protruding or shielding mechanisms having sensing devices in the distal end of various types to detect at proximal position [ ] each step of movement of distal protruding portion including various retractable safety trocar systems.

Y 7145. This document, which I find to be authentic, shows that by 1978 Yoon had conceived of the general idea of a safety trocar that would use sensors in conjunction with protruding and shielding mechanisms to enable the surgeon to detect the position of the cutting tip relative to the abdominal wall. The document also shows that by 1978 Yoon had conceived of the general idea of a retractable safety trocar.[8]

### b. **Yoon's Work with Choi**

14. Yoon met Choi in early 1980, after Choi settled in the Baltimore area. They met through Choi's spouse, who was an operating room nurse at a hospital where Yoon had privileges. Mrs. Choi told Yoon that her husband had a background in electronics and was interested in inventing things.

15. During a visit to Yoon's home in February 1980, Choi showed Yoon a stereo amplifier, which he had designed and built, and told Yoon about an idea he had for an aerosol

---

6. Before meeting with Konigsberg, Yoon disclosed the concept and design of the monitoring device to his patent attorney, Tipton D. Jennings, IV. See PX 356, PX 367, PX 368.

7. A safety shielded trocar has two sleeves: an outer sleeve, which does not retract, and an inner sleeve or "shield," as it is called, which does retract. When the cutting tip of the trocar penetrates the abdominal wall, the shield springs forward and covers the tip, thereby protecting internal organs against injury.

8. The defendants have moved to strike this exhibit on the ground that it is hearsay. The document is admissible under Fed.R.Evidence 801(d)(1)(B) as a prior statement consistent with Yoon's testimony that he conceived of the subject matter of the claims at issue before he met Choi. Allowing the document to remain in evidence is appropriate because it was offered to rebut an express charge that Yoon's testimony concerning his conception of the subject matter of the claims before he met Choi is false. Defendants had an adequate opportunity to cross-examine Yoon concerning the document at the hearing. Accordingly, defendants' motion to strike is denied. See generally, *Tome v. United States*, —— U.S. ——, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).

can that could be used even when tilted sideways or upside down. Yoon questioned Choi about his electronics background and asked him to build a prototype of the aerosol can.

16. On a subsequent visit to Yoon's home around Easter 1980, Choi demonstrated a working prototype of the aerosol can. Yoon asked if Choi could design an electronic sensor that would detect and signal when a baby's diaper had become wet. Choi said that he could and subsequently delivered a working prototype to Yoon. Choi also gave Yoon a working prototype of an electronic wireless stethoscope.

17. In mid–1980, Yoon suggested to Choi that they should work together developing new products. Discussion of Yoon's proposal led to an informal understanding between Yoon and Choi that they would work together. Yoon and Choi agreed that Choi would be responsible for the technical side of the business, that Yoon would be responsible for determining whether a product would be commercially viable or patentable and that any products would be promoted in Yoon's name. Neither of them would receive any salary. Any profits would be shared.[9]

18. Choi subsequently worked with Yoon on a number of projects. The most important project involved Yoon's effort to develop a safer trocar. Yoon sought Choi's help in connection with the safety trocar project because of Choi's expertise with regard to electronics and his demonstrated interest in inventing things.

19. Choi was not familiar with trocars. Yoon showed Choi a conventional trocar and explained the risk of accidental injury posed by use of conventional trocars.

20. Choi worked with Yoon on the safety trocar project until late 1981 or early 1982. He worked on the project at night and on week-ends. He worked alone at his own apartment and worked with Yoon at Yoon's

house. During their collaboration on the project, Yoon and Choi occasionally worked through the night discussing the project, sharing their expertise and know how and exchanging ideas.

21. While working on the safety trocar project, Choi created a variety of documents, including sketches of retracting trocars (DX 48, Y1163; DX 31, Y964), a sketch of an electronic blunt probe trocar (DX 48, Y1151), a sketch relating to use of fiber optics with trocars (DX 79, Y2225) and drawings of sensors and circuits. Some of the sketches were made while Choi and Yoon sat together at Yoon's house exchanging ideas. See, e.g., DX 79. Choi also built or modified prototypes of certain instruments and circuits.

22. On January 14, 1982, Choi sent Yoon a letter. DX 122. Among other things, the letter stated:

"I regret it exceedingly, but I must inform you that I myself cannot participate in the planned business activity of Dr. Yoon.

"However, if you need assistance regarding the 'Safety Trocar' on which Dr. Yoon has been making progress until now, I will accept responsibility for that only.

"But I will not consider a monetary interest at all.

"Not as a member of Dr. Yoon's planned business, but with the hope of continuing to earn his goodwill as before, May God bless dear Dr. Yoon ever more!"

23. Choi sent the letter to Yoon because he was exhausted, felt he had nothing more to contribute to the project and was concerned that Yoon regarded his work on the project as a failure. Choi wanted to continue to have a working relationship with Yoon and hoped to elicit through the letter reassurance that Yoon wanted to continue to have a working relationship with him. The letter was very deferential in content and tone because

---

**9.** Plaintiffs contend that Choi worked without pay for Yoon because he wanted to be associated with an elder. Choi respected Yoon and valued their relationship. However, plaintiffs' contention that he was a volunteer with no financial interest in the work he did with Yoon is rejected. Choi's testimony concerning his informal part-

nership agreement with Yoon was credible, finds some support in handwritten notes made by Yoon reflecting discussion of a business arrangement between Yoon and Choi (DX 79, Y22273–2274) and was not disputed by Yoon at the hearing.

Choi did not want to embarrass Yoon. Yoon did not respond to the letter.

24. After January 1982, Yoon and Choi no longer spoke or saw each other on a regular basis. Choi felt rejected by Yoon. Choi visited Yoon's house occasionally but they no longer worked together.

25. Even though Yoon did not respond to Choi's letter, Choi still trusted Yoon to some extent and reasonably relied on Yoon to tell him if the safety trocar project ever resulted in a commercially viable product or patent encompassing Choi's work on the project.

### c. Yoon's Application for the '773 Patent

26. In mid–1981, Yoon asked patent attorney Robert E. Bushnell to begin work on the application that became the '773 patent. Yoon had previously shown Bushnell a prototype of a safety shielded trocar with a tactile sensor.

27. Yoon and Bushnell had a series of discussions concerning the patent application and discussed the subject matter of the application in detail. Yoon provided Bushnell with drawings and made some drawings in Bushnell's presence. Bushnell made notes of his discussions with Yoon. PX 513.

28. Yoon did not tell Choi about his retention of Bushnell and Choi did not know that Yoon had retained a lawyer to apply for a patent in connection with the safety trocar project.

29. On March 26, 1982, Yoon applied for the '773 patent. The application was prepared by Bushnell. In the application, Yoon swore that he was the sole inventor of the subject matter claimed in the patent. Based on details provided by Yoon in the course of their discussions, Bushnell believed that Yoon was the sole inventor. Tr. 1285–86.

30. At the hearing in this case, Bushnell testified that Yoon mentioned Choi's name to him while they were working on the application for the '773 patent. Bushnell's recollection that Yoon mentioned Choi appears to be uncertain. He testified at his deposition that he did not recall hearing Choi's name.

Whatever Yoon might have said to Bushnell about Choi, Bushnell had the impression that any contribution Choi might have made was limited to that of a draftsman.

31. Bushnell does not recall receiving Choi's sketches of a retracting trocar (DX 31, Y964; DX 48, Y1163), electronic blunt probe trocar (DX 48, Y1151) or fiber optic trocar (DX 79, Y2285). If Bushnell had seen those sketches and been told they were Choi's, he probably would have asked Yoon about Choi and the nature and extent of Choi's contributions to the safety trocar project. Because he did not see them, no such inquiry took place.

32. Figure 1 of the patent (DX 1) is a drawing of a safety shielded trocar that Bushnell drew based on the prototype provided by Yoon. Figure 1 shows a tactile sensor, wire 71 with tip 76, which was on the prototype. Using an electrical cord, Yoon showed Bushnell that the tactile sensor could be used to activate light emitting diodes in an electrical minibox like the one shown in Figure 6 of the patent. Bushnell asked Yoon to have tracings made of the circuitry contained in the minibox. Shortly before the patent application was filed, Yoon gave Bushnell drawings of two electronic circuits. Bushnell postponed filing the application until he got the drawings from Yoon. The drawings, which became Figures 5 and 30 of the patent, had been prepared by Choi. Bushnell assumed that the drawings had been made by a draftsman.

33. Choi's name appears on some of the documents that were submitted to Bushnell. However, Yoon did not direct Bushnell's attention to Choi's name on the documents, Bushnell did not focus on Choi's name and Choi's name was overlooked by Bushnell.

34. Drawings of sensors and circuits that were originally prepared by Choi were submitted to Bushnell after being redrawn and retyped by Yoon and his wife. Comparison of the original drawings with the redrawn, retyped documents submitted to Bushnell shows that Choi's name was deleted by the Yoons.[10]

---

**10.** Mrs. Yoon testified that she whited-out Choi's name to provide Bushnell with a legible copy.

35. On August 20, 1985, the '773 patent was issued to Yoon. The claims of the patent are directed primarily at a safety shielded trocar. Choi does not contend that he is a coinventor of the safety shielded trocar disclosed in the patent.

### d. Subsequent Events

36. Yoon did not tell Choi about the issuance of the '773 patent and Choi did not know about it.

37. Sometime in 1987 or 1988, Choi went to Yoon's house for a visit. On arriving there, he encountered Yoon, Mrs. Yoon and Yoon's financial advisor, James R. Glover, who was getting ready to leave. Yoon introduced Glover to Choi and explained in general terms that Glover was helping him negotiate a licensing agreement for a safety trocar patent with U.S. Surgical. Tr. 1675. Choi shook hands with Glover, nodded his head but said nothing. Tr. 1676.

38. Sometime after 1986, possibly after his encounter with Glover, Choi went to the PTO with a friend in connection with a matter unrelated to safety trocars.[11] While there, Choi undertook to determine whether a patent had been issued to Yoon in connection with the safety trocar project. He looked up Yoon's name in an index believing the index to be complete and found a patent that related to trocars in that it contained a figure that looked like a trocar. Choi copied the patent and took it home. The patent he copied was not the '773 patent and did not relate to safety trocars.[12]

39. Choi first learned of the existence of the '773 patent when he was contacted by counsel for U.S. Surgical in June 1992. On learning that a patent had been issued, Choi called Yoon. As of that date, Choi had not yet seen the '773 patent. In that phone conversation, Yoon told Choi that Choi did not contribute anything to the '773 patent.

40. Choi subsequently received a copy of the '773 patent from U.S. Surgical's counsel. After reviewing the patent, he wrote a letter to U.S. Surgical's counsel enclosing a marked-up copy of the patent. See PX 404. The letter stated in part:

"I scanned the file and the paper work, and I marked the points which are 100% my spell [sic] or concept by color marker.

Also, I can see this crafty man converted and hide [sic] many of my concept [sic] into the claim [sic]." In marking-up the patent, Choi circled Figure 34, which depicts a retractable trocar, and wrote in the margin of column 5: "Fig. 34 is 100% Young Choi's concept." Numerous paragraphs of the patent's description of the invention were also marked-up by Choi, as were many of the patent's claims.

41. After reviewing the '773 patent, Choi called Yoon. During that phone conversation, Yoon asked Choi for help in connection with his patent infringement suit against U.S. Surgical and repeated his earlier statement that Choi contributed nothing to the '773 patent. The motion to correct the inventorship of the patent was filed shortly thereafter.

### D. *The Credibility of Yoon and Choi*

To resolve the factual issues presented by the parties, it is necessary to consider certain matters affecting the credibility of Yoon and Choi.

42. During a deposition in April 1990, before he knew Choi would be a witness in the case, Yoon testified that he met Choi in 1975 when he went to South Korea looking for a technician who could help him with regard to electrical sensors. In fact, he met Choi in Baltimore in 1980. At the hearing, he was asked to explain his deposition testimony. In response, he first stated that he was confused at the deposition. Later, he stated that he had confused Choi with some-

---

Yoon testified that Choi's name was whited-out accidentally as a result of a mistake.

**11.** Whether Choi went to the PTO before or after his encounter with Glover is unclear. The evidence is insufficient to support a finding one way or the other.

**12.** Choi has lost the copy that he made at the PTO. However, I credit his testimony that the patent he copied was not the '773 patent.

body else. Neither answer appeared to be truthful.

43. At his deposition in April 1990, before he knew Choi would be a witness, Yoon was shown the documents contained in Defendants' Exhibits 158 and 159. Defendants' Exhibit 158 consists of 34 pages of drawings bearing Bates stamp numbers Y1148 through Y1182; Defendants' Exhibit 159 consists of 3 pages bearing Bates stamp numbers Y1145 through Y1147. After stating that he had seen the documents before, Yoon testified without qualification that he authored the documents. Asked by U.S. Surgical's counsel, "Have you looked at the documents completely? Did you author the entire text of each document?", Yoon was cautioned by his own counsel to "Take some time and look at the whole stack of documents." Yoon then repeated his unequivocal affirmative answer making it appear that he was the sole author of all the documents.

Yoon's deposition testimony was not accurate. All but a few of the 34 documents contained in Defendants' Exhibit 158 were drawn by Choi. The deposition testimony deals with a matter of significance, rather than a minor detail, because the documents Yoon claimed to have authored are drawings Choi relies on to prove his claim of coinventorship. See DX 158, Y1150–Y1165.

44. At the hearing, Yoon was shown Defendants' Exhibit 158 and asked whether he testified at his deposition that all the drawings contained in the exhibit were done by him. Tr. 664–671. Yoon replied, "If I said [that] at that time, then maybe I was confused." Tr. at 665. Later he testified that he "was not really pay[ing] attention" at the deposition and was "completely confuse[d]." Tr. at 668. I do not believe that Yoon testified as he did at the deposition because he failed to pay attention or was confused. The deposition transcript shows that the questions put to him were simple and straightforward. His counsel explicitly advised him to look at all the documents before answering.

45. In October 1992, after the close of discovery in this case, Yoon proffered a num-

ber of documents he purportedly prepared before he met Choi. Yoon proffered the documents as exhibits to an affidavit he submitted in opposition to the motion to correct inventorship. See DX 17, Ex. 2–6. In his affidavit, Yoon stated: "These documents confirm that, before I met Mr. Choi, I conceived the ideas that Mr. Choi claims are his...." DX 17 at 5.

46. The documents Yoon proffered as attachments to his affidavit consist of a series of drawings. The drawings are dated and signed. Each drawing appears to have been completed in the same ink before being dated and signed. At U.S. Surgical's request, the documents were examined and tested for authenticity by Lyndal Shaneyfelt, an expert examiner of questioned documents. Shaneyfelt examined the documents using reflected infrared photography, infrared luminescence photography and indentation analysis. Based on his examination, Shaneyfelt concluded that the documents display a clear pattern of additions of safety trocars, springs, shields and electronics and that the additions were probably made at the same time, sometime after 1978.

47. Shaneyfelt also examined six other documents produced by Yoon after the close of discovery. See Defendants' Exhibits 66, 83, 89, 92, 95, 98. His examination of those documents revealed the same pattern of additions of safety trocars, springs, shields and electronics.

48. At the hearing, Shaneyfelt testified that the pattern of additions he found when he examined and tested Yoon's documents was "one of the clearest" patterns of alterations he has seen in his forty years' experience as a document examiner. He further testified that, in his opinion, all the additions were made at the same time, after 1978 at the earliest, in response to some stimulus that prompted Yoon to make the additions.

49. Yoon was present throughout Shaneyfelt's testimony at the hearing and had an opportunity to deny altering the documents. However, he did not do so.[13]

---

**13.** One of the documents proffered by Yoon in opposition to the motion to correct inventorship purports to have been witnessed by Attorney

Jennings on November 10, 1977. See DX 17, Ex. 4. Based on Shaneyfelt's tests, it appears that sketches of a trocar were added to the docu-

50. Shaneyfelt was an impressive witness and his testimony is well-supported by a series of striking exhibits demonstrating the clear pattern of additions revealed through his tests. See DX 323, 330, 334, 337, 340, 343, 346, 349, 350, 353, 364, 370, 373, 376, 379, 382 and 384.

51. Based on Shaneyfelt's testimony, which stands unrefuted, I find that Yoon has altered documents and proffered them in this case in an effort to defeat Choi's claim that he is a coinventor.

52. Yoon has admitted backdating documents. One example is Defendants' Exhibit 29. After this document was created by Choi in 1980 or 1981, Yoon made the following entries on the document:

— "August 20/21, '75, InBae Yoon with Mr. Choi until 2:00 a.m."

— "Okay work with us. Thank you, Mr. Choi. I.B. Yoon August 20, '75."

Yoon selected the August 1975 date after confirming with Mrs. Yoon that he had been traveling in Korea at that time. Yoon has admitted that he wanted anyone who saw the document to believe it was prepared in Korea in 1975.

53. At his deposition in 1990, Yoon did not acknowledge backdating Defendants' Exhibit 29 or attempt to provide any explanation for the backdating. Instead, he gave testimony he now admits was wrong, that the reference to 1975 reflected a meeting in a hotel room in Korea where he and Choi worked until 2:00 a.m.

54. Another example of backdating is provided by Defendants' Exhibit 34. After Choi created this document in 1981, Yoon backdated it to reflect a date of November 17, 1979 and added the following instruction to Choi: "Make at least 4 alternative Yoon safety trocar systems by Nov. 30, '79. I.B. Yoon." Though Choi never saw this instruction, Yoon testified at his deposition that the instruction referred to a request he made in 1979 for Choi to build four prototypes.

55. Other documents prepared by Choi in 1980 or 1981 were backdated by Choi at Yoon's express direction to reflect a date in 1975. Those documents include drawings by Choi contained in Defendants' Exhibits 31, 48 and 79. Yoon told Choi that backdating the drawings to 1975 would be helpful later if there was a patent dispute. Choi asked Yoon what he should do if somebody asked him about the 1975 date. Yoon advised Choi not to worry. Yoon told Choi that if anyone asked about the 1975 date, Choi should say that he and Yoon met in a hotel in Seoul at that time.

56. At the hearing, Yoon testified that he asked Choi to make and backdate certain documents so he could use them in a patent dispute with a company called "Olympus." Yoon testified that he was angry and upset at the time because he had just learned that Olympus had stolen his invention of a safety trocar system, which he had discussed with Olympus between 1976 and 1978. Yoon testified that he asked Choi to do him the favor of re-creating what had been disclosed to Olympus by making drawings and backdating them. Yoon testified that Choi then drew what Yoon told him to draw.

57. Yoon's patent attorneys have testified that he was very upset with Olympus in 1981; there is some evidence that Yoon settled a patent dispute with Olympus in the early 1980's; and the word "Olympus" appears among notes Choi wrote while speaking with Yoon. On the other hand, Choi testified that the documents in question reflect his ideas, not Yoon's; that Yoon did not refer to a patent dispute with Olympus as a reason for backdating documents; and that, while he might have heard about a dispute with Olympus, he thought it related to Yoon's patent for a fallopian ring applicator.

58. Having observed and listened carefully to both Choi and Yoon, and having considered their conflicting testimony in light of all the evidence, I believe Choi's testimony and do not believe Yoon's. Unlike Yoon, Choi appeared to be doing his best to testify truthfully at the hearing. His testimony that the drawings reflect his creative input is consistent with the documents themselves. The drawings appear to be the work of a person

ment after it was witnessed by Jennings. See DX 53 through DX 56 and DX 334. Jennings testi-

fied on behalf of Yoon at the hearing but was not questioned about the document.

with knowledge of electronics who is using his expertise to try to devise a solution to a problem, rather than the efforts of one who merely drew, scrivener-like, what someone else told him to draw, especially someone with no electronics background like Yoon.

59. Yoon's explanation that he asked Choi to make and backdate the documents in a fit of anger was never advanced until the hearing. Asked to explain why he did not disclose or explain the backdating at his deposition in this case in 1990, many years after he settled with Olympus, Yoon testified that he was confused by the questions at his deposition and had forgotten about the backdating. I observed Yoon carefully when he gave that testimony and do not believe that he was confused at his deposition or had forgotten about the backdating.

60. I find that Yoon backdated documents and instructed Choi to backdate documents because, as he told Choi at the time, he assumed it could prove helpful to him in any patent dispute that might arise in the future. Having backdated the documents with that general purpose in mind, Yoon attempted to use them to his advantage in this case.

### E. *Claim Analysis*

61. The four claims of the '773 patent at issue in this case are: claim 23, which covers means for providing a signal to the surgeon on movement of the shield (i.e. inner sleeve) of a safety shielded trocar; claim 33, which covers a blunt probe trocar; claim 46, which covers a fiber optic trocar; and claim 47, which covers a retractable trocar.

#### a. **Claim 23: Signal Upon Movement of Safety Shield**

62. Claim 23 of the '773 patent is written in means plus function language, as permitted by 35 U.S.C. § 112, ¶ 6.[14] The claim reads as follows:

"The instrument of claim 1, 4, 6 or 7 further comprising means carried by said accommodating means [the trocar cannula] and contacting said shielding means [the in-

ner sleeve] for following axial movement of said shielding means relative to said accommodating means and for creating a sensible condition in response to said axial movement."

63. The specifications of the patent relating to claim 23 disclose both a tactile means and a switching mechanism for sensing movement of the safety shield. The patent teaches that six sensors depicted in Figures 31A–E can be used in place of the switch.

64. U.S. Surgical and Choi contend that the concept of providing the surgeon with a signal on movement of the shield was Choi's idea, not Yoon's. However, the evidence they have offered is not convincing.

65. Konigsberg's deposition testimony establishes that Yoon had the general idea of using sensors to sense the movement of the safety shield before he met Choi. Moreover, it was Yoon, not Choi, who disclosed the tactile means for following the safety shield to Bushnell. According to Bushnell, that disclosure occurred in the summer or fall of 1980 when he received a prototype of the safety shielded trocar. Choi does not claim that he contributed to the conception of the safety shielded trocar or the tactile means for following movement of the shield.

66. I find that the concept of using tactile and other means to generate a signal to the surgeon on movement of the safety shield originated with Yoon, not Choi.

67. Defendants contend that Choi is a coinventor of claim 23 because he designed a means of sensing movement of the safety shield.

68. In 1981, Choi sent Yoon a letter setting forth a design of a sliding switch as a means of sensing movement of the inner sleeve or shield. DX 20. Figure 3 of the patent shows the same concept, although it differs from Choi's drawing in that it shows use of a plunger switch rather than a sliding switch.

---

**14.** 35 U.S.C. § 112, ¶ 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or

acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof."

69. Choi's letter corroborates his testimony that he conceived of the design shown in the letter. However, I am not convinced that the design itself is inventive.

70. Melvin C. Garner, the plaintiffs' expert on electrical engineering and patent law issues, testified that if Yoon asked Choi to design a switch for sensing movement of the shield and Choi's contribution was limited to designing the switch set forth in the letter, Choi's contribution should not be regarded as inventive. Garner was a credible witness and I am persuaded by his opinion on this point.

71. Choi testified that he selected and designed the six sensors set forth in Figures 31A–E. Yoon contends that he selected the sensors. I need not resolve this conflict because, even if Choi selected the sensors, I am not convinced that his contribution in this regard makes him a coinventor.

72. Garner testified that the sensors are obvious substitutes for the switch. I credit his opinion on this point.

73. Accordingly, I find that U.S. Surgical and Choi have failed to prove by clear and convincing evidence that Choi is a coinventor of Claim 23.

### b. Claim 33: Blunt Probe Trocar

74. Claim 33 describes a trocar with a spring-loaded, blunt probe located in an aperture of a trocar blade. The blunt probe is designed to spring forward when the trocar penetrates the abdominal wall. On springing forward, the blunt probe protects internal organs from the trocar blade.

75. The blunt probe trocar is comprised of the following elements: (a) a trocar with an aperture in the blade; (b) a blunt probe that slides through the aperture; (c) a spring connected to the probe that biases the probe to protrude beyond the aperture unless it is subjected to counterpressure sufficient to force it to recede; and (d) a means that responds to the movement of the probe and creates a sensible signal indicating the probe's position.

76. The design of the blunt probe trocar is shown in Figure 18 of the patent. See sheet 3.

77. The general idea of making a trocar with a blunt probe was Yoon's. The concept is traceable to Yoon's use of a Verres needle, a needle-like trocar that has a spring-loaded retractable tube inside a sharpened cylinder. When a Verres needle is used to pierce the abdominal wall, the tube retracts inside the cylinder until the wall is pierced, then springs forward.

78. Yoon's idea of using a blunt probe to create a safer trocar is also traceable to his safety endoscope, which is the subject of U.S. Patent No. 4,254,762 (DX 3). The '762 patent was issued to Yoon in 1981 based on an application filed in 1979. The safety endoscope consists of a trocar with a sharpened distal end for puncturing the abdominal wall and an endoscope that is biased by a spring to extend beyond the sharp tip. When pressure is applied to the distal end of the endoscope, it recedes into the body of the trocar against the bias of the spring.

79. At his deposition in this case, Choi testified that Yoon was "the first" to bring up the blunt probe concept. Choi Dep. 100. At the hearing, on being asked whether he had ever seen or heard of a Verres needle, Choi testified that the blunt probe was based on the "same concept" and that "Dr. Yoon brought it up." Tr. 226–27. Choi also testified that it was Yoon who raised the possibility of using a blunt probe and a sensing mechanism to create a signal. Tr. 381.

80. At the hearing, Choi testified that he conceived of locating the blunt probe in the trocar shaft and putting the probe through an aperture in the blade surface. I credit his testimony.

81. Choi's credible testimony that he conceived of these elements of the blunt probe trocar is corroborated by a sketch he drew while working with Yoon, Defendants' Exhibit 48, Y1151. The sketch contains the elements of the invention disclosed in Figure 18 of the patent. The presence of each element is confirmed by comparing Defendants' Exhibit 302, which provides a color coded list of the elements of the invention, and Defendants' Exhibit 219, which contains color coded versions of Choi's drawing and Figure 18.

82. Plaintiffs contend that Yoon thought of putting the blunt probe in the trocar shaft before he met Choi. They rely on Plaintiffs' Exhibit 297, Y 7139, a black ink drawing signed by Yoon and his wife on July 15, 1973, which displays a blunt probe in green ink. This document was produced by Yoon after Choi's deposition was taken. If the green probe is disregarded, the black object that remains looks like a fallopian ring applicator described by Yoon in figure 10 of U.S. Patent No. 3,870,048 (DX 5), a patent he applied for on July 30, 1973. At the hearing, Mrs. Yoon testified that, to the best of her recollection, everything that now appears on the document appeared on it when she signed it in 1973. Tr. 1420. On cross-examination, Yoon testified that he cannot recall when the green probe was added. Tr. 1664. Considering the untimely production of this document, Yoon's admitted backdating of documents and his alteration of other documents, I find that this document is too unreliable to be given any weight.

83. After considering all the evidence presented by both sides, I am convinced that the idea of placing the blunt probe in the trocar shaft was Choi's, not Yoon's.

84. Plaintiffs contend that Claim 33 covers Figure 27 of the '773 patent, which resembles a Verres needle. Choi does not claim that he is a coinventor of the instrument depicted in Figure 27.

85. Figure 27 is not within the scope of Claim 33 because it does not have a trocar blade surface that (a) tapers into a sharp distal point and (b) is perforated along one side by an aperture.

86. Claim 33, which was originally presented as application claim 30, was rejected as obvious in light of the '762 patent (DX 3) and another patent. The claim was amended to replace language requiring a "shaft having a distal end with a tapered distal edge," as shown in Figure 27, with language requiring a "shaft having a distal end with a distal blade surface" that "taper[s] into a sharp distal point" and is "perforated along one side by an aperture." DX 2, Aug. 15, 1983 Amendment, p. 10. Yoon argued that the amended claim was distinguishable over his '762 patent because the '762 patent "teaches only an outer hollow cylinder having a sharpened distal end, and nowhere teaches or suggests either a distal blade surface or a distal blade surface having a side perforated by an aperture." Id. Figure 27 does not have the required "blade surface" or the "aperture" in the "side" of the "blade surface." Like the prior art disclosed in the '762 patent, Figure 27 shows only a hollow cylinder with a sharpened distal end.

87. Plaintiffs note that Claim 33 was allowed only after the addition of an abutment member and, on that basis, contend that the abutment member is the only point of novelty. However, in seeking approval of the application based on the addition of the abutment member, Yoon argued:

Alternatively, claim 30 was previously amended to include means having a blunt distal bearing surface slidably reciprocating through an aperture in the blade surface of an elongate member having a sharp distal point. These features are also conspicuously absent from either Yoon or Turkel because both disclose only unshielded elongate members having sharp or tissue cutting surfaces at their distal ends. DX 2, Amendment of May 21, 1984, at 22.

88. U.S. Surgical and Choi contend that the last element of Claim 33, the means for "creating a sensible signal," includes within its scope the networks of Figures 5 and 30 of the patent. Figure 5 appears on sheet 4; Figure 30 appears on sheet 11. Bushnell held up filing the patent application waiting for those figures so he could disclose the best mode of practicing the invention as required by 35 U.S.C. § 112.

89. Figures 5 and 30 are redrawn versions of network drawings prepared by Choi. See DX 26 and DX 34. Yoon made no contribution to the creation of either drawing. Both drawings were copied into the patent after being redrawn.

90. Figures 5 and 30 differ from Choi's drawings in that certain parts of the drawings appear to have been misunderstood by the person who redrew them. See DX 205 and DX 206. A person skilled in the art would notice the errors and correct them.

91. Defendants' expert witness, Dr. Martin F. Schlecht, a professor in the electrical engineering department at the Massachusetts Institute of Technology, testified that the networks of figures 5 and 30 are the structures disclosed in the patent that provide a means for creating a sensible signal to the surgeon regarding the position of the probe. Professor Schlecht was a credible witness and I credit his opinion on this point.

92. In support of their contention that claim 33 covers figures 5 and 30, U.S. Surgical and Choi also presented the testimony of Professor Donald Chisum, an expert in patent law. He testified that, pursuant to 35 U.S.C. § 112, ¶ 6, the claim must be construed to include the networks of Figures 5 and 30 because they are the only structures disclosed in the patent that satisfy the requirement of a means for "creating a sensible signal" to the surgeon indicating the position of the probe. Professor Chisum was a credible witness and I give weight to his opinion on this point.[15]

93. In support of their contention that claim 33 does not cover the networks of figures 5 and 30, plaintiffs rely on the testimony of their expert witness, Mr. Garner. He testified that the requirement of a means for creating a sensible signal could be satisfied by switch 92, which might be noisy enough in operation to signal the surgeon as to the position of the probe. Tr. 1754. He further testified that if an electrical signal were necessary, wires 202 could be hooked up to a battery and a bell or a battery and a light or a battery and a buzzer, any of which would provide a sensible signal. Tr. 1754–55.

Garner's testimony on this point was not persuasive. The possibility that switch 92 might be noisy enough to provide a sensible signal to the surgeon is not mentioned in the patent specification and appears to be wholly speculative. Moreover, while an electronic network is not the only structure that could

be hooked up to wires 202 to create a sensible signal to the surgeon indicating the position of the probe, no other structure for performing that function is disclosed in the patent.

94. Plaintiffs contend that the alarm networks of figures 5 and 30 are not included in claim 33 because they are not mandatory. The patent specification states that "[s]witch 92 *may* contain contacts for two or more electrical leads 102" ('773 Patent, col. 8, lines 65–66) and that "[t]he switch *may* be coupled via electrical leads 202 to an electronic network 110" ('773 patent, col. 13, lines 16–18) (emphasis supplied). Plaintiffs argue that the word "may" shows that the alarm network is merely optional. However, the word "may" is used repeatedly throughout the specification to refer to matters that are not optional. See, e.g., Col. 6, lines 22 through 35 (trocar blade "may" be introduced into proximal end of lumen of valve assembly; sharp point of trocar "may" be pushed longitudinally forward; thin-walled inner sleeve "may" be placed inside outer sleeve); col. 6, lines 58 through 68 (hole "may" be drilled through wall of outer sleeve; wire "may" be wound into loops; groove "may" be cut; tip of wire "may" be bent inward); col. 7, lines 22 through 25 (incision "may" be made and inner sleeve "may" be placed against incision).[16]

95. At the hearing, Mr. Garner seemed to imply that, in his opinion, Choi's design of the circuits contained in Figures 5 and 30 should not be regarded as inventive. Tr. 1763–1765. Plaintiffs have not proposed a finding to that effect and I can find no testimony by Garner or anyone else that would adequately support such a finding. Given the technical nature of the circuits, I am unable to find that Choi's design was not inventive as a matter of law.

96. Professor Schlecht testified that, in his opinion, Claim 33 represents the inven-

---

15. See *In re Donaldson Co., Inc.*, 16 F.3d 1189 (Fed.Cir.1994).

16. Professor Schlecht testified that the word "may" in the patent specification should not be construed to mean that use of the networks is optional. In his opinion, the word "may" in the patent specification should be construed to mean

that the networks can be connected to the switch by electrical leads, as shown in Figure 18, or fitted directly into the head of the trocar, as shown in Figure 19. Tr. 1099–1100. Professor Schlecht's opinion provides some evidence of how the language of the patent would be understood by an electrical engineer.

tive work of Choi. He based his opinion on, among other things, Choi's blunt probe drawing and Choi's electronic network drawings that were copied into the patent as Figures 5 and 30. See Tr. 954–55. I credit his opinion.

97. Accordingly, I find that U.S. Surgical and Choi have proven by clear and convincing evidence that Choi is a coinventor of Claim 33.

### c. Claim 46: The Fiber Optic Trocar

■ 98. Claim 46 of the '773 patent describes a surgical instrument that the parties refer to as a "fiber optic trocar." The instrument consists of a trocar sleeve with two sets of fiber optic cables arranged in an annular sheath around the interior periphery of the sleeve. Both sets of fiber optic cables extend the length of the sleeve. One set transmits light to and emits light from the distal end of the sleeve; the other receives light emitted by the first set at the distal end and conducts it to the proximal end. The sleeve allows for insertion of a trocar. When the trocar tip penetrates the abdominal wall, the intensity of the light received by the second pair of cables diminishes.

99. The design of the fiber optic trocar is shown in Figures 37, 38 and 39 of the patent (sheet 14).

100. The elements of Claim 46 are (a) the sleeve (b) the fiber optic cables that emit light and (c) the fiber optic cables that detect light (d) with the cables arranged to form an annular sheath around the interior periphery of the sleeve. See DX 303.

101. Choi contends that he came up with the idea of using fiber optic cables to both emit and receive light in order to detect penetration of a cavity wall. He testified that the idea of using fiber optics as a means of both transmitting and receiving light was his, not Yoon's, and that Yoon had nothing to do with this concept. He also contends that he conceived of arranging the cables in an annular sheath.

102. Prior to meeting Choi, Yoon conceived and reduced to practice an annular sheath of fiber optic cables around the interior periphery of the sleeve of an endoscopic instrument. While performing procedures involving multiple endoscopic instruments, he observed that fiber optic cables of one instrument would receive at their distal ends light emitted from the cables of another instrument and would conduct that light to their proximal ends. As a result of his experience as a practitioner, he knew that the intensity of reflected light from the fiber optic cables in an endoscopic instrument decreases when the instrument passes through the tissues of a cavity wall into an open cavity.

103. Bushnell testified that Yoon disclosed the concept of the fiber optic trocar to him in a manner that showed a thorough understanding of the concept. A sketch Yoon drew at the time corroborates Bushnell's testimony. See PX 513.

104. To corroborate Choi's claim that he is a coinventor of claim 46, the defendants rely primarily on a sketch Choi drew while working with Yoon. Defendants' Exhibit 79, Y2285. By adding certain elements to the sketch, they have made it appear to be a drawing of fiber optic cables forming an annular sheath. See DX 222. Though this sketch arguably provides some corroboration for Choi's testimony, its probative value is slight. The sketch is so rough, it is difficult to tell what the sketch represents. Choi testified that the documents contained in Defendants' Exhibit 79, including this sketch, were drawn while he and Yoon sat at a table exchanging opinions and ideas. Given Yoon's previous work with fiber optics and endoscopes and the detailed knowledge he displayed to Bushnell regarding the fiber optic trocar, I am not convinced that the sketch reflects Choi's ideas, rather than Yoon's.

105. Weighing all the evidence, I find that U.S. Surgical and Choi have failed to prove by clear and convincing evidence that Choi is a coinventor of claim 46.

### d. Claim 47: The Retractable Trocar

■ 106. Claim 47 of the '773 patent describes a surgical instrument referred to by the parties as a "retracting" or "retractable" trocar. The instrument is designed to provide for automatic retraction of the trocar into a sleeve after a sensor on the tip senses penetration of the abdominal wall.

107. Claim 47 contains the following elements: (a) a trocar for puncturing the abdominal wall; (b) a sensor in the tip that responds to counterpressure exerted by the abdominal wall by converting the counterpressure into transmissible energy; (c) wires that convey the transmissible energy toward the proximal end of the trocar; (d) a sleeve; (e) a tension spring that pulls the trocar's proximal end into the sleeve; and (f) a plunger or bar that holds the proximal end of the trocar in place and prevents it from being pulled into the sleeve by the spring.[17]

108. The figures of the '773 patent that illustrate the design of the retracting trocar are Figures 34, 35 and 36. See sheet 13.[18]

109. Choi testified that he conceived of the retracting trocar disclosed in the patent and that Yoon ignored the concept when it was first presented to him. Yoon testified that he conceived of the retracting trocar independently of Choi.

110. To corroborate Choi's testimony, U.S. Surgical and Choi rely primarily on certain documents Choi prepared while working on the safety trocar project with Yoon, including sketches of retracting trocars. DX 31, Y955–964; DX 48, Y1163.

111. The elements of the retracting trocar described in the patent appear in Choi's sketches. DX 31, Y964; DX 48, 1163. Compare Defendants' Exhibit 304, which contains a color coded list of the elements of the invention, with Defendants' Exhibits 214 and 220, which are color coded versions of Choi's sketches.

112. The retracting trocars depicted in Choi's sketches differ from the instruments shown in Figures 34, 35 and 36 of the patent in a number of ways.[19] Nevertheless, Figures 34 and 35 resemble the trocar that appears in Defendants' Exhibit 48 at Y1163 and Figure 36 resembles the trocar that appears in Defendants' Exhibit 31 at Y964.

113. Professor Schlecht testified that Choi's drawings show an organized approach to teaching the invention, which indicates that Choi was teaching Yoon. Tr. 889–899 (discussing the drawings contained in DX 31) and 899–908 (discussing the drawings contained in DX 48). He further testified that some of the drawings deal with sophisticated concepts only an electrical engineer would understand. Tr. 893–895. Consistent with Professor Schlecht's opinion, which I credit, I find that the drawings reflect an effort by Choi to teach Yoon how a retracting trocar could be made to work using sensors and a plunger or bar controlled by a solenoid.

114. Though Choi's drawings tend to corroborate his testimony that he conceived of all the elements of the retracting trocar, I am not persuaded that he did so. The retracting trocar sketches are not technical in nature, embodying concepts only an electrical engineer would understand. They are rough sketches that outline the elements of the retracting trocar. Yoon might well have described one or more elements to Choi,

---

17. Claim 47 does not include a means for retracting the trocar into the sleeve. See Tr. 1121, 1148 (no means claimed for structure that would take action of causing retraction to occur) (testimony of Professor Schlecht).

18. Figures 34 and 35 show a trocar that is spring-loaded with a bias toward its proximal end. The tip of the trocar extends beyond the sleeve. The trocar is held in that extended position by a plunger, which prevents the trocar from being pulled into the sleeve by the spring. Sensors in the tip of the trocar sense the counterpressure that is exerted against the tip by the abdominal wall during the puncturing procedure. When the sensors sense the drop in pressure that occurs on penetration of the abdominal wall, a signal is sent to a solenoid device, which becomes a magnet and pulls the plunger out of its position, permitting the trocar to be pulled into the sleeve by the spring.

Figure 36 shows an alternative design of a retracting trocar. Under this design, a bar located at the proximal end of the trocar shaft prevents retraction of the trocar into the sleeve. When the tip of the trocar penetrates the abdominal wall, a signal is sent, energizing a solenoid, which then moves the bar, allowing the end of the trocar shaft to align with a hole in the bar, permitting retraction of the trocar into the sleeve.

19. The sketch contained in Defendants' Exhibit 48 at Y1163 has no inner cylinder for receiving the retracting trocar shaft, shows a spring attached to both the trocar shaft and sleeve, shows a plunger on the proximal side of the spring and has a shaft of uniform diameter. Similarly, the drawing in Defendants' Exhibit 31 at Y964 also lacks an inner cylinder.

prompting him to include them in the sketches.

115. Other credible evidence indicates that Yoon conceived of at least some elements of the retracting trocar independently of Choi:

a. Konigsberg's deposition testimony shows that Yoon conceived of using sensors in the cutting tip of a trocar before he met Choi.

b. PX 491 shows that Yoon conceived of using sensors in connection with a retractable trocar.

c. U.S. Patent No. 3,911,923 ('923 patent) (PX 255), entitled "Occlusion Ring and Method and Device for Its Application," which was issued to Yoon in 1975, establishes that Yoon conceived of using a tension spring in conjunction with a lock to create a retractable tubular structure before he met Choi.

116. In light of Yoon's longstanding interest in developing a trocar that would use sensors and a retractable element, Choi's testimony that he alone conceived of the retracting trocar is implausible. Moreover, his testimony is at least somewhat inconsistent with testimony he gave when he first appeared in the case. At a deposition in October 1992, Choi was asked whether Yoon mentioned the concept of putting sensors in the trocar tip before Choi mentioned it to him. Choi replied: "I don't think so, but I don't know, sir. I cannot recall exact [sic]. It's been 12 years, 10 years." Choi Dep. Tr. 394–95. Choi was also asked whether Yoon had worked on a retractable trocar prior to their work together. Choi answered: "I don't know, sir."

117. After careful consideration of all the evidence, I find that U.S. Surgical and Choi have failed to prove by clear and convincing evidence that Choi conceived of all the elements of the retracting trocar independently of Yoon. However, I am convinced that it was Choi, not Yoon, who conceived of using a plunger or bar to hold the retractable trocar

in an extended position and prevent it from being pulled into the sleeve by the spring.

118. Professor Schlecht testified that, in his opinion, based on Choi's drawings and testimony, it was Choi who conceived of this particular element of claim 47. Tr. 910–911. I credit his opinion on this point.

119. The '923 patent covering Yoon's ring applicator shows that Yoon knew how to use a lock in conjunction with a spring to create a retractable device. See PX 255, Sheet 3, Figures 7 and 8. But the locking mechanism of the ring applicator, which is operated mechanically, is not at all like the locking mechanism of the retracting trocar, which relies on sensors and a solenoid to release the plunger or bar.[20]

120. Yoon did not have a complete conception of the retracting trocar disclosed in the patent, including use of a plunger or bar to maintain the trocar in an extended position, prior to meeting Choi. It was Choi, not Yoon, who conceived of that element of the retracting trocar.

121. Accordingly, I find that U.S. Surgical and Choi have proven by clear and convincing evidence that Choi is a coinventor of claim 47.

### III. *Conclusions of Law*

1. A patent is valid only if all true inventors are named. See *Jamesbury Corp. v. United States*, 207 Ct.Cl. 516, 518 F.2d 1384, 1395 (1975) (inclusion of more or less than true inventors renders patent void). *Amax Fly Ash Corp. v. United States*, 206 Ct.Cl. 756, 514 F.2d 1041, 1050 (1975) (same).

2. 35 U.S.C. § 256 provides for correction of misjoinder or nonjoinder of inventors in issued patents. Correction is liberally allowed if the error occurred without deceptive intent. See *Coleman v. Dines*, 754 F.2d 353 (Fed.Cir.1985); *A.F. Stoddard & Co., Ltd. v. Dann*, 564 F.2d 556, 564, 566 (D.C.Cir.1977).

---

**20.** Yoon testified that he knew the "locking portion" of the retracting trocar could be controlled by a solenoid before he met Choi but that he forgot about it until he learned it again from Choi. Tr. 1591. I do not believe that Yoon developed this concept himself or learned of it from others before meeting Choi.

■ 3. An issued patent is presumed to be valid. 35 U.S.C. § 282. The presumption of validity extends to the patent's inventorship.

4. The presumption of proper inventorship is based on the "temptation for honest witnesses, who have worked years with a patentee to implement his ideas, to forget whose ideas they were." *Acme Highway Products Corp. v. D.S. Brown Co.*, 431 F.2d 1074, 1083 (6th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971).

■ 5. Correction of a patent will not be ordered over the objection of a named inventor except on the basis of clear and convincing evidence.

### A. *Choi's Testimony Regarding His Inventive Contributions Is Adequately Corroborated*

■ 6. Plaintiffs contend that Choi cannot obtain correction of the '773 patent because his testimony that he made an inventive contribution to the safety trocar project is not corroborated by independent evidence. A party seeking to prove conception may not rely solely on the oral testimony of the alleged inventor. Because conception is a mental act, some form of corroborating evidence—*i.e.*, evidence in addition to the inventor's oral testimony—is required. *See Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1228 (Fed.Cir.1994), *cert. denied*, ____ U.S. ____, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996); *Price v. Symsek*, 988 F.2d 1187, 1194–96 (Fed.Cir.1993) (corroboration required to prove earlier date of conception); *Maxwell v. K Mart Corp.*, 880 F.Supp. 1323, 1329–30 (D.Minn.1995). If the alleged inventor's oral testimony is not corroborated, it cannot be credited. See *AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F.Supp. 808, 821–22 (M.D.Pa.1994) (corroboration required to prove claim by alleged joint inventors that subject matter of certain claims was conception of just one inventor).[21]

■ 7. Whether an alleged inventor's oral testimony concerning conception is sufficiently corroborated by other evidence to be given independent weight is determined by a rule of reason analysis, which requires a "reasoned examination, analysis and evaluation of all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached." *Hayhurst v. Rosen*, No. CV–91–4496, 1992 WL 123178, at *10 (E.D.N.Y. May 18, 1992) (citation omitted); *see also Price*, 988 F.2d at 1195.

■ 8. Written descriptions, drawings or models are corroborating evidence, when there is sufficient proof that they existed at the pertinent time. *See, e.g., Price*, 988 F.2d at 1195–96; *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376–78 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). It is undisputed that Choi's drawings were created in 1980 and 1981, and transmitted to Yoon and his patent attorneys, before the application for the '773 patent was filed.

9. Plaintiffs contend that Choi's sketches cannot be considered as corroborating evidence because there is no independent evidence that the sketches reflect Choi's conceptions rather than Yoon's. In a coinventorship case like this one, where it is undisputed that the person claiming to be a coinventor prepared sketches resembling figures of the patent and the named inventor says that the other simply drew what he was told to draw, the trier of fact should be able to assess the sketches in light of all the evidence to determine whose conceptions they reflect. If the trier is convinced that the sketches reflect an inventive contribution by the person who prepared them, and rejects as unworthy of belief the named inventor's assertion that the other merely drew what he was told to draw, the trier should be able to consider the documents as corroborating evidence. Otherwise, the named inventor could prevail simply by asserting that the other

---

21. Plaintiffs also contend that the patent cannot be corrected because defendants have failed to prove derivation (i.e. that the subject matter claimed in the four claims of the patent at issue in this case was derived by Yoon from Choi).

This argument, which was raised for the first time after the hearing, is untenable. Defendants do not claim that Choi is the sole inventor of the subject matter of these four claims. They claim he is a coinventor.

drew what he was told to draw, regardless of how incredible that assertion might be.

■ 10. Oral testimony by someone other than the alleged inventor may provide corroboration of the alleged inventor's testimony. *See Kardulas v. Florida Mach. Prods. Co.,* 438 F.2d 1118, 1121 (5th Cir. 1971). Because the purpose of corroboration is to have a means of evaluating the truthfulness of the alleged inventor's testimony, persuasive corroborating evidence that someone is a joint inventor—when this assertion is being contested by the named inventor—is the testimony of the alleged joint inventor's adversary. *Cf. Hayhurst,* 1992 WL 123178, at *11 (on motion for summary judgment, court recognized that corroboration that unnamed inventor was the actual inventor could be found in the named inventor's testimony about the unnamed inventor's contributions). Thus, Yoon's testimony concerning his work with Choi on the safety trocar project is additional corroborating evidence.

11. An alleged inventor's oral testimony can be corroborated by circumstantial evidence. Choi's testimony that he made inventive contributions to the safety trocar project is corroborated by the following circumstantial evidence: Yoon's need for a person with expertise in electronics; Choi's background in electronics; Yoon's proposal that he and Choi should work together developing new products, including safety trocars; the informal business relationship between Yoon and Choi; the length of time Yoon and Choi worked together on the project; the fact that Choi was not paid for his work; the similarity between Choi's sketches and the figures of the patent; and Choi's letter to Yoon of January 1982, in which Choi stated that he could no longer be involved as a "member" of Yoon's "business."

12. After a "reasoned examination, analysis and evaluation of all pertinent evidence," I conclude that Choi's testimony about his inventive contributions to the '773 Patent is sufficiently corroborated to be given independent weight. *Hayhurst,* 1992 WL 123178, at *10; *see also Price,* 988 F.2d at 1195.

## B. *Choi is a Coinventor of The '773 Patent*

13. A patented invention can be the work of two or more inventors, who are considered "joint" inventors. *See* U.S.C. § 116.

■ 14. An inventor is one who contributes to the final conception of that which is covered by the patent claims. *See Rodgard Corp. v. Miner Enters. Inc.,* 12 U.S.P.Q.2d 1353, 1356, 1989 WL 41727 (W.D.N.Y.1989). A sole inventor is one who is solely responsible for conception of the invention. In contrast, if two or more persons contribute jointly to the conception of the invention, they are joint inventors.

■ 15. Conception is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc.,* 802 F.2d at 1376 (citations omitted); *see also Burroughs,* 40 F.3d at 1228.

■ 16. For conception, the inventor must have "a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." *Burroughs,* 40 F.3d at 1228. In other words, an inventor must (1) not only have an "idea of the structure of the [invention]," (2) but also must possess "an operative method of making it." *Oka v. Youssefyeh,* 849 F.2d 581, 583 (Fed.Cir.1988).

17. "An entrepreneur's request to another to create a product that will fulfill a certain function is not conception—even if the entrepreneur supplies continuous input on the acceptability of offered products." *Hayhurst,* 1992 WL 123178, at *11 (*citing Morgan v. Hirsch,* 728 F.2d 1449, 1452 (Fed. Cir.1984)).

■ 18. Conception is complete only when the idea is so clearly defined in the inventor's mind that one with ordinary skill in the art could construct the invention and reduce it to practice without extensive research or experimentation. *See Burroughs,* 40 F.3d at 1228.

■ 19. A joint invention is "the product of the collaboration of the inventive en-

deavors of two or more persons working together toward the same end and producing an invention by their aggregate efforts." *Monsanto Co. v. Kamp,* 269 F.Supp. 818, 824 (D.D.C.1967); *see also Burroughs,* 40 F.3d at 1227 ("A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed."); *Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co.,* 973 F.2d 911, 915–16 (Fed.Cir.1992).

20. Each of the joint inventors need "not make the same type or amount of contribution." 35 U.S.C. § 116; *see also Burroughs,* 40 F.3d at 1227. "Each needs to perform but a part of the task if an invention emerges from all of the steps taken together." *Monsanto,* 269 F.Supp. at 824.

21. If a person makes a practical and concrete suggestion that contributes to the invention, he is considered a joint inventor. *See Shields v. Halliburton,* 493 F.Supp. 1376 (W.D.La.1980), *aff'd,* 667 F.2d 1232 (5th Cir.1982); *see also Fina Technology Inc. v. Ewen,* 857 F.Supp. 1151 (N.D.Tex.1994), *appeal dismissed mem. by,* 41 F.3d 1519, 1994 WL 649175 *and by* 45 F.3d 442, 1994 WL 692737 (Fed.Cir.1994).

22. Joint invention can exist even if "the major share of the inventive effort is accomplished by one joint inventor working alone prior to the collaboration." *Shields,* 667 F.2d at 1235. If the other contributes to the final conception of the invention, both are joint inventors. *See id.* at 1235; *see also Burroughs,* 40 F.3d at 1229, 1232.

23. If an inventor uses another's services to perfect an invention, and the other's work contributes to the conception of the invention, then the other is considered a joint inventor. *See William R. Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co.,* 226 F. 941, 947–49 (3d Cir.1915); *Rodgard Corp.* 12 U.S.P.Q.2d at 1356.

24. If a prior invention of one inventor is modified as a result of the collaborative effort of joint inventors, the modified invention may become a joint invention. *See General Motors Corp. v. Toyota Motor Co.,* 667 F.2d 504, 506–07 (6th Cir.1981), *cert.*

*denied,* 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982).

25. Each joint inventor is not required to "make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116; *see also Smithkline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 888 (Fed.Cir.1988); *United States Surgical Corp. v. Hospital Prods. Int'l Pty. Ltd.,* 701 F.Supp. 314, 340 (D.Conn.1988). An inventive contribution to one claim is enough.

26. "[J]oint inventorship may be inferred from collaboration of effort to produce a complete and operative invention." *In re Image Storage/Retrieval Sys., Inc.,* Misc. No. 92–0003, 1992 WL 25373, at *4 (E.D.Pa. Feb. 7, 1992); *Rodgard Corp.* 12 U.S.P.Q.2d at 1356.

27. "The more specific the conception of a putative inventor or co-inventor, in terms of structural details, or details of process steps, the more likely such a person is an inventor or co-inventor, *other things being equal."* Harris, *Conceptual Specificity As A Factor In Determination Of Inventorship,* 67 Journal of the Patent and Trademark Office Society 315, 333 (1985) (emphasis in original).

28. A person can attain the status of a coinventor by originating a specific design improvement that makes an invention operable. *Jamesbury Corp.,* 518 F.2d at 1395–96.

29. Based on all the credible evidence presented by both sides, I conclude that Choi is a coinventor of the subject matter claimed in claims 33 and 47 of the '773 Patent.

## C. *Section 256 Authorizes Correction of the Patent*

30. 35 U.S.C. § 256 provides:

"Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intent on his part, the Commission may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error."

"The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly."

31. U.S. Surgical and Choi allege that "Dr. Yoon erroneously swore that he was the sole inventor" of the '773 patent and that "the error in failing to name Mr. Choi as a co-inventor was made without deceptive intent on the part of Mr. Choi." Am.Answer to Am.Compl. with Fourth Am.Countercls. at ¶¶ 23, 26. U.S. Surgical and Choi contend that these allegations satisfy the requirements of section 256 and provide a basis for correcting the patent to add Choi as a coinventor even if Yoon acted with deceptive intent.

32. The District Courts that have considered whether section 256 permits correction of a patent as long as there was no deceptive intent on the part of the omitted inventor have determined that the statute permits correction of a patent only if the error occurred without deceptive intent on the part of any true inventor. *Stark v. Advanced Magnetics, Inc.,* 894 F.Supp. 555, 560 (D.Mass.1995) (certifying issue to Federal Circuit pursuant to 28 U.S.C. § 1292(b)); permission to appeal granted, 79 F.3d 1165, 1996 WL 97229 (Fed.Cir.1996).

33. The appropriate interpretation of section 256 does not have to be addressed in this case because I find that Choi was omitted from the patent without deceptive intent on the part of Yoon.

34. Yoon had a motive to omit Choi because, as the sole inventor named in the patent, he would not have to share the benefits of the patent with Choi. However, Yoon might well have had a good faith belief that Choi was not a coinventor for the following reasons:

a. The boundaries of joint inventorship are unclear even to legal experts. See W. Fritz Fasse, *The Muddy Metaphysics of Joint Inventorship: Cleaning Up After the 1984 Amendments to 35 U.S.C. § 116,* 5 Harv.L.J. & Tech. 153 (1992).

b. The claims of the patent are directed primarily at safety shielded trocars, which Choi does not claim to have invented.

c. Based on the evidence presented in this case, it appears that Choi's contribution to the patent was relatively minor compared to Yoon's. Viewed from Yoon's perspective, Choi's contribution might appear to be too insignificant to warrant designating him as a coinventor.

d. Mrs. Yoon's whiting-out of Choi's name on the circuit drawings that were delivered to Bushnell arguably permits the inference that the Yoons were trying to conceal Choi's name from Bushnell. However, Choi's name appears on other documents that were given to Bushnell and Bushnell recalls Yoon mentioning Choi's name. Yoon's disclosure of Choi's name to Bushnell undermines the inference that Yoon tried to deceive Bushnell by concealing Choi's name.

e. Yoon's disclosure of Choi's name to Bushnell put Bushnell on notice that Yoon worked with Choi on the safety trocar project. Bushnell could have inquired about Choi but did not do so.

f. There is no evidence that Yoon affirmatively misled Bushnell concerning Choi's role.

35. Yoon's conduct in connection with this litigation indicates that he does not take seriously the obligations of an oath. However, it does not necessarily follow that he intended to deceive the PTO when he swore that he was sole inventor of the subject matter of the patent.

36. Weighing all the evidence, I decline to find that Yoon omitted to name Choi as a coinventor with deceptive intent.

37. Accordingly, I conclude that section 256 permits correction of the patent to add Choi as a coinventor.

### D. *Choi Is Not Barred From Obtaining Relief*

#### a. **Laches**

38. Section 256 does not limit the time during which the inventorship of an

issued patent can be corrected by a court. See *Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.,* 988 F.2d 1157, 1162 (Fed.Cir.1993). "Section 256 thus serves the public policy of preserving property rights from avoidable forfeiture. See *Henderson v. Carbondale Coal & Coke Co.,* 140 U.S. 25, 33, 11 S.Ct. 691, 694, 35 L.Ed. 332 (1891) ('[F]orfeitures are never favored. Equity always leans against them, and only decrees in their favor when there is full, clear and strict proof of a legal right thereto.')." *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1573 (Fed.Cir.1994).

◼ 39. Though section 256 contains no time limit, lack of diligence on the part of an omitted inventor may preclude him from obtaining correction of a patent in some circumstances. *Stark,* 29 F.3d at 1575 (summary judgment that claim for correction of patent barred due to lack of diligence reversed).

◼ 40. Whether diligent action is required of an omitted inventor and, if so, whether he should be barred from obtaining relief for failing to act with appropriate diligence depends on all the facts and equities of each case, including the omitted inventor's reason for not filing suit at an earlier time, the length of the delay in filing suit, the nature and extent of any unfair prejudice the named inventor would suffer if the suit were allowed to proceed, and whether the delay is attributable to any conduct on the part of the named inventor.

◼ 41. If undue delay and unfair prejudice are established, the omitted inventor is not necessarily barred from obtaining relief. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1036 (Fed.Cir.1992) (en banc).

◼ 42. The informal partnership arrangement between Yoon and Choi and the trust Choi placed in Yoon obligated Yoon to tell Choi in mid–1981 that he had retained Bushnell to apply for a patent in connection with the safety trocar project. Yoon's failure to tell Choi about his retention of Bushnell caused Choi to reasonably believe that no such action had been taken. If Yoon had told Choi about his retention of Bushnell and their intent to file a patent application, it is highly unlikely that Choi would have written the letter he sent to Yoon in January 1982.

43. Yoon never told Choi about the patent application. Yoon's failure to tell Choi about the application deprived Choi of an opportunity to assert his coinventorship claim before the application was filed and thereafter before the patent was issued.

44. Given the terms of their informal partnership arrangement, and the trust Choi placed in Yoon as evidenced by his January 1982 letter, Yoon had a duty to tell Choi if a patent ever issued containing claims encompassing Choi's work. Yoon never fulfilled that duty to Choi. Had Yoon told Choi about the '773 patent and provided him with a copy of it, as he should have done, Choi would have been obliged to act promptly if he wanted to assert a coinventorship claim. Yoon's failure to tell Choi weighs heavily against Yoon now.

45. Yoon contends that Choi's brief, fortuitous encounter with Glover put him on notice of the issuance of a patent to Yoon relating to safety trocars. Yoon's statement that Glover was helping him negotiate a license for a patent relating to safety trocars did not serve to put Choi on notice that Yoon had obtained a patent covering the claims at issue in this case. Whatever comments Yoon might have made in introducing Glover that day, they fell far short of fulfilling Yoon's duty of disclosure to Choi.

46. Yoon's claim of unfair prejudice is based primarily on his licensing agreement with Ethicon, which he says he would not have signed had he known the inventorship of the '773 patent might be disputed by Choi. The Glover encounter was in 1987 or 1988. Yoon entered into the licensing agreement with Ethicon in June 1988. On this record, the Glover encounter preceded the licensing agreement by not more than approximately one year and perhaps by as little as a few months. Such a brief period of delay is insufficient to invoke the bar of laches except in compelling circumstances not present here.

47. On learning about the '773 patent, Choi called Yoon promptly to discuss the matter. The motion to correct the patent

was filed thereafter without unreasonable delay.

48. Weighing all the facts and equities of this unusual case, I conclude that Choi did not treat Yoon unfairly by failing to seek correction of the patent at an earlier time. Accordingly, I conclude that he is not barred from obtaining correction of the patent.

### b. Equitable Estoppel

49. Yoon contends that Choi is estopped from seeking correction of the patent.

50. Equitable estoppel requires proof that "[t]he actor, who usually must have knowledge of the true facts, communicate[d] something in a misleading way." *A.C. Aukerman*, 960 F.2d at 1041.

51. Yoon has failed to prove that Choi, with knowledge of the true facts relating to the '773 patent, misled Yoon into believing that he would not assert an interest in the patent as a coinventor.

52. Accordingly, Choi is not estopped from obtaining correction of the patent.

## IV. *Conclusion*

For all the foregoing reasons, the motion to correct the '773 patent to add Choi as a coinventor is hereby granted.

It is so ordered.